**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| v. | No. 18-cr-251 (BAH) |
| **KELVIN OTUNYO** | |
| Defendant. | |

**EMERGENCY MOTION FOR RELEASE FROM CUSTODY DUE TO IMMEDIATE THREAT POSED BY COVID-19 PANDEMIC**

Kelvin Otunyo, through counsel, respectfully moves this Court to order his immediate release from custody under 18 U.S.C. § 3142 and the Fifth and Eighth Amendments to the United States Constitution. The United States Attorney's Office opposes Mr. Otunyo's release.

**INTRODUCTION**

Circumstances in the United States and the DC Jail have radically changed since Mr. Otunyo was detained on August 31, 2018. Since then, COVID-19 has emerged as a global and national health emergency. At least twenty-eight inmates inside the D.C. Department of Corrections ("DOC")— have tested positive for COVID-19. Courts all over the country, including in this district, have started acknowledging the dangerousness that COVID-19 poses to our detention facilities and started ordering the immediate release of prisoners.[1]

---

[1] *See, e.g.*, *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an

Judge Moss, for example, recently released a defendant charged with both gun and drug offenses from pretrial detention in light of the COVID-19 pandemic. *See* Min. Order, *United States v. Brent Jaffee*, No. 19-cr-88 (RDM) (D.D.C. Mar. 26, 2020). As he stated,

> [T]he Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement. All responsible government agencies have advised of the risk of transmission posed by large gatherings, and the Court understands the defendant is housed in a unit with dozens other detained individuals. The risk of the spread of the virus in the jail is palpable, and the risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real. On the other hand, if defendant is confined at home

---

independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence defense"); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) ("*[t]he nature* of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *Coronel v. Decker*, 20-cv-2472-AJN, Dkt. No. 26 (Mar. 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19); *Basank v. Decker*, 20-cv-2518 (S.D.N.Y. Mar. 26, 2020) (same).

> and has contact only with his wife, the risk to him (including his heightened risk due to the underlying health condition he disclosed to the Court) and to others will be significantly reduced).

*Id.*; *see also United States v. Mclean,* No. 19-cr-380-RDM, Dkt. No. 21 (D.D.C. Mar. 28, 2020) (releasing defendant charged with multiple firearms and controlled substance offenses because "COVID-19 . . . not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Harris*, No. 19-cr-356-RDM, Dkt. No. 36 (D.D.C. Mar. 26, 2020). Other judges in this district have similarly ordered the immediate of inmates because of the COVID-19 pandemic. *See, e.g.*, *United States v.* Meekins, No. 18-cr-222-APM (Mar. 31, 2020) ("[T]he court finds that 'exceptional reasons' exist to release the Defendant from confinement pending sentencing [under] 18 U.S.C. § 1345(c). The 'exception reason' is, of course, the COVID-19 pandemic and its arrival and potential spread within the Department of Corrections' facilities."); *United States v. Appiah*, No. 19-cr-361-BAH (D.D.C. Mar. 26, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH (Mar. 28, 2020).

These Courts have done so for good reason. Scientists worldwide advise that the two most important steps to take to limit COVID-19's spread are good hygiene and social distance. However, both are nearly impossible at the DC Jail. The jail is notoriously unhygienic, with little access to soap and water. Hand-sanitizer, which can also kill the virus, is contraband because its high alcohol content makes it a potential for abuse. Additionally, prisoners have no way to practice "social distancing" or other protective measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection. Instead, they are forced to put themselves in great danger by sitting in the communal barracks, using the communal bathroom, and eating in the communal cafeteria.

As stated previously, there are twenty-eight inmates in the DC Jail who have tested positive for COVID-19. Now, each day in custody brings greater and greater risks to Mr.

Otunyo. When more inmates get sick, there will be fewer infirmary beds and greater risk of contracting the virus. When the medical staff gets sick, there will be fewer people to provide care. And as the correctional staff gets sick, there will be fewer officers available to bring sick people to the infirmary, hospital, or even just keep an eye on who is showing signs of illness. The combination of lack of adequate sanitation, close quarters, and limited medical capacity create the perfect COVID-19 storm.

Mr. Otunyo is charged with a non-violent offense, is not a flight risk, and any concerns could be addressed by home detention and GPS monitoring. Furthermore, counsel anticipates that the government will argue that based on Mr. Otunyo's immigration status and the underlying charges, he is a serious risk of flight. However, based on national pandemic, Mr. Otunyo has no ability to flee. Furthermore, there is nothing in Mr. Otunyo's background that would suggest his failure to appear at court appearances. Right now, both Mr. Otunyo's own life and the safety of the community will best be protected by his release.

The emerging consensus among public health experts is that it is absolutely critical to reduce incarceration in order to contain the spread of this virus. *See* Ex. C—Beyrer Dec. ¶ 15; *see also* Exs. A-G. It is equally critical for Mr. Otunyo's own safety. He respectfully asks for release.

## BACKGROUND[2]

**A. COVID-19 is a national crisis without precedent in our lifetime.**

As of March April 7, 2020, SARS-COV-2, a novel coronavirus causing COVID-19, has infected over 1.279 million people worldwide, leading to at least 72,614 deaths, and 12,561

---

[2] As the Court knows, this situation is extremely fast moving. This information is based on the best information available as of April 7, 2020. By the time this motion is heard, the situation is likely to be more severe.

deaths in the United States.[3]  The President has declared a national emergency.[4]  Our country is still behind the curve on community testing, and we do not know the true extent of community spread.[5]  Because of the virus' long latency period, studies show that "stealth" transmission by infected persons with low or no symptoms has played a "major role" in the pandemic.[6]  New data published in the New England Journal of Medicine found that the highly-contagious "virus can remain viable and infectious in aerosols for hours and on surfaces up to days."[7]  The White House has advised the public to avoid gathering in groups of more than 10 people.[8]

Mayor Muriel Bowser declared a Public Health Emergency in the District of Columbia.[9]  She issued an Order identifying COVID-19 as an imminent threat to the health, safety and welfare of D.C. residents, requiring emergency protective actions to be taken by the D.C.

---

[3] *See Coronavirus disease 2019 (COVID-19): Situation Report—69*, World Health Org. (Apr. 7, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports.

[4] Taylor Telford, *U.S. markets surge as massive economic stimulus plan takes shape to offset coronavirus*, Wash. Post, (March 18, 2020) , https://www.washingtonpost.com/business/2020/03/17/us-stock-markets-today-fed-funds/.

[5] Sheri Fink, *'It's Just Everywhere Already': How Delays in Testing Set Back the U.S. Coronavirus Response*, N.Y. Times, (March 10, 2020), https://www.nytimes.com/2020/03/10/us/coronavirus-testing-delays.html.

[6] Melissa Healy, *How 'silent spreaders' are fueling the coronavirus pandemic*, L..A. Times (March 17, 2020), https://www.latimes.com/science/story/2020-03-17/how-silent-spreaders-are-fueling-the-coronavirus-pandemic; CDC Emerging Infectious Diseases, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020,* (March 12, 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article ("persons with asymptomatic COVID-19 can spread the virus").

[7] Neeltje van Doremalen, et. al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med., (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973.

[8] Kevin Liptak, *White House advises public to avoid groups of more than 10*, CNN, (March 16, 2020), https://www.cnn.com/2020/03/16/politics/white-house-guidelines-coronavirus/index.html.

[9] D.C. Government (March 11, 20202), at https://coronavirus.dc.gov/release/mayor-bowser-declares-public-health-emergency.

Government.[10]  She further ordered all non-essential businesses in the District of Columbia to close.[11]  As of April 7, 2020, Washington, DC reported 1121 confirmed cases of COVID-19 and 22 deaths associated with it.[12]  More confirmed cases will surely follow.

### B.  COVID-19 is continuing to spread exponentially.

The virus is spreading exponentially. Overall, COVID-19's basic reproduction number is somewhere between 2.4 and 3.8, which means that "each newly infected person is estimated to infect on average 3 additional persons." Beyrer Dec. ¶ 10. Because of this, the virus is spreading at a rapidly accelerating rate. The WHO's epidemic curve from March 29, 2020 confirms this alarming acceleration:



---

[10] D.C. Government, Order of the Mayor (March 11, 2020), at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicHealthEmergency03.11.20.pdf.

[11] D.C. Government, Order of the Mayor (Mach 24 2020), at https://coronavirus.dc.gov/release/mayor-bowser-orders-closure-non-essential-businesses.

[12] https://wtop.com/local/2020/03/coronavirus-test-results-in-dc-maryland-and-virginia/.

### C. COVID-19 is an extremely dangerous disease.

COVID-19 is an extremely dangerous disease. The best estimate for its overall fatality rate—i.e., its fatality rate among all demographics—is 0.3-3.5%, "which is 5-35 times the fatality associated with influenza infection." Beyrer Dec. ¶ 5; *see also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26(6) EID Journal (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article. Fatality rates vary wildly, however, depending on both environmental and demographic risk factors.

The death rate for those deemed at risk is even higher. It increases rapidly with age. Across all age groups, COVID-19 kills:

- 13.2% of people with cardiovascular disease
- 9.2% of people with diabetes
- 8.4% of people with hypertension
- 8% of people with chronic respiratory disease
- 7.6% of people with cancer[13]

---

[13] *See* World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 28, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; *see also* Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv at 5 (Feb. 27, 2020), *available at* https://www.medrxiv.org/content/10.1101/2020.02.25.20027664v1.full.pdf (finding that even after adjusting for age and smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, and the number for two comorbidities was 2.59).

### D. COVID-19 presents a great threat to our nation's prisons and jails.

Incarceration poses a grave public health threat during this crisis. Much like cruise ships and nursing homes, jails are extremely dangerous in a pandemic, given the impossibility of social distancing in a confined space.[14] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[15]

"According to health experts, it is not a matter of if, but when, this virus breaks out of jails and prisons."[16] As established by the growing number of positive tests at DC jail, conditions of pretrial confinement create the ideal environment for the transmission of the highly contagious COVID-19. Furthermore, inmates do not live under quarantine—people cycle in and out of DOC pretrial facilities daily from all over the world and the country, and people who work in the facilities leave and return daily, with limited screenings. All of these individuals potentially can carry the virus from the facility to their homes and communities, and then return back, bringing new infections with them.

Thus, when outbreaks occur in jails, this leads directly to increased spread beyond the confines of jail. *See* Beyrer Dec. ¶ 12. "It is therefore an ***urgent priority*** in this time of national

---

[14] Dr. Jeffrey Keller, *COVID-19 in Jails? It Might Get Ugly,* Medpage, (March 12, 2020), https://www.medpagetoday.com/blogs/doing-time/85366.

[15] *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY; *see also* Laura M. Maruschak et al., *Pandemic Influenza and Jail Facilities and Populations,* 99 Am. J. Pub. Health Supplement 2 (2009) (urging, in regard to the flu, that "During a pandemic, jail medical services will likely be insufficient to treat large numbers of sick inmates; further, local hospitals may be overburdened and unable to admit inmates who are seriously ill with influenza.").

[16] Dr. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, The New York Times (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.amp.html.

public health emergency to reduce the number of persons in detention as quickly as possible." Ex. C—Beyrer Dec. ¶ 17 (emphasis added).

### E. The DC jail is particularly ill-equipped to prevent a deadly outbreak—in the last three days, sixteen inmates have tested positive for COVID-19.

COVID-19 has entered the DC Jail.  To date, an alarming twenty-eight people have tested positive.  This is notable because, "as of March 22, 2020, the DOC reported that there were no known positive tests by inmates and indeed no inmates who were symptomatic."  *See* Gov't Opp. in *United States v. Meekins*, No. 18-cr-222-AMP, ECF No. 70 at 4 n.1 (D.D.C. 2020) (claiming that "[t]he defendant renders a conclusory opinion that DOC is simply unsafe" and that the "DOC is continuing to ensure its employees and its inmates' safety.").  More positive cases will surely follow.

The DC Jail is ill-equipped to prevent an outbreak for numerous reasons: First, the screening processes are wholly inadequate as they do not include testing, and people can be asymptomatic carriers of COVID-19. Second, the DOC does not meet Department of Health regulations on a normal day, notwithstanding the current pandemic. *See* Office of the D.C. Auditor, *Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks* at 3, 7 (Feb. 28, 2019) ("2019 DOC Audit Report") (explaining DOC's 30-year history of "severe overcrowding, unsafe facilities, and unsanitary conditions" and noting repeated noncompliance with standards of sanitation). Third, the DOC's ventilation system has been repeatedly cited as not in compliance with acceptable standards. *See* 2019 DOC Audit Report at 7. Fourth, the evidence shows that DOC has already failed to quarantine and care for inmates effectively, as more inmates have tested positive within the last few days.

On March 20, 2020, the union representing correctional officers unanimously voted "no

confidence" in DOC's ability to handle COVID-19.[17] Similarly, on March 29, 2020, the Fraternal Order of the Police Labor Committee for the DOC issued a press release that scathingly rebukes the DC Jail's preparedness for this crisis:

> Our conclusion is two-fold: (1) the City does not have the resources to combat COVID-19, and the Jail is the lowest priority among the health and safety community; and (2) the City wants to keep the truth from the public. The mayor said as much at a recent press conference when she announced that corrections officers will not be provided with protective equipment because the officers do not provide medical care. . . . DOC is not following the 'Guidance on Management of COVID-19 at Correctional and Detention Facilities,' issued and updated regularly by the Center for Control Disease. . . . Cleaning and disinfection of the Housing Units is inadequately performed by inmates, and the Department of Health has not conduction inspections of the Housing Units to our knowledge. . . DOC misleads the public in its reporting of positive cases of COVID-19 among inmates. Testing is inadequate at the D.C. Jail. Inmates are only tested when it is too late to protect other inmates, and the results take almost six hours.

*See* Ex. G—Press Release, Fraternal Order of Police, Department of Corrections Labor Committee (Mar. 29, 2020). The press release makes one thing clear: the DC Jail is entirely ill-equipped to handle COVID-19 and the ramifications for both the incarcerated population and correctional staff will soon be dire.

At this moment in our national history there can be no doubt: "[r]eleasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Ex. C—Beyrer Dec. ¶ 19.

Public health experts agree that reducing incarceration is crucially important at this time – when we have all been directed to avoid crowds greater than 10, and when our own courts are

---

[17] Sophie Kaplan, *Union votes 'no confidence' in D.C. Jail leaders for handling of COVID-19*, The Washington Times (Mar. 20, 2020), available at https://www.washingtontimes.com/news/2020/mar/20/union-votes-no-confidence-dc-jail-leaders-handling/.

shutting their doors to the public in order to protect court staff and contain COVID-19's spread. Under these circumstances, Mr. Otunyo should be released.

## DISCUSSION

Mr. Otunyo's continued detention during the COVID-19 pandemic violates the mandates of the Bail Reform Act, the Fifth Amendment's Due Process Clause, and the Eighth Amendment's prohibition on cruel and unusual punishment.

### A. The Bail Reform Act empowers the Court to release Mr. Otunyo for COVID-19-related reasons.

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Earlier on in this case, the magistrate court ordered Mr. Otunyo detained. Since that time, circumstances have radically changed. Now, Mr. Otunyo's continued incarceration poses a grave danger to both 1) Mr. Otunyo and 2) the community.

### 1. Mr. Otunyo's continued detention poses a grave risk to him.

The courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). *See also United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM)

11

2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

As a result of the ongoing pandemic, Mr. Otunyo faces tremendous health risks. Considering all of the enumerated risk factors, continued detention of Mr. Otunyo poses a grave threat to his health. Prisons are breeding grounds for disease, and it is almost a certainty that a severe outbreak of COVID-19 will occur at the DC Jail. *See* Greifinger Dec. ¶ 9. Mr. Otunyo must be released.

### 2. Mr. Otunyo's continued detention poses a grave risk to the community.

Mr. Otunyo's continued detention also poses a grave risk to the community. The more people remain detained in detention facilities, the greater the likelihood of an unchecked outbreak of COVID-19 within our detention facilities and jails. *See* Beyrer Dec. ¶ 11. Such an outbreak will impact inmates, correctional officers, and the communities of which those inmates and officers are a part. Additionally, if Mr. Otunyo falls ill, he will very likely be in critical condition, consuming precious resources that are needed to contain this pandemic. If Mr. Otunyo remains detained in the DC Jail, his detention will pose a risk not only to Mr. Otunyo himself, but also to the community.

### 3. Failing to dramatically reduce prison populations in the United States is contrary to sound public health policy.

Despite the Bail Reform Act's promise, federal courts rely on pretrial detention at an alarmingly high rate. *Salerno* says that release should be the "norm," yet federal district courts routinely detain defendants more often than they release them. Between 1995 and 2010, the number of federal criminal defendants detained pretrial jumped by 184%. *See* U.S. Dep't of

Justice, Office of Justice Programs, *Pretrial Detention and Misconduct in Federal District Courts, 1995-2010* (2013).[18] And defendants on pretrial release commit crimes and fail to appear at strikingly low rates – hovering around 1% and 2%. *See id.*

These numbers show that federal district courts historically err on the side of caution when they make release determinations. They *over-detain* relative to the requirement that all "doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (citations omitted).

Like so much else that has had to change so quickly during these times, public health demands that the instinct change. We are now in a situation where incarceration poses a grave public threat, such that we must be prepared to accept the risk of pretrial release in order to protect our communities from the dangers posed by concentrated populations and community spread. The epidemiological community speaks with one voice on this point:

- Dr. Beyrer from Johns Hopkins University: "Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Ex. C—Beyrer Dec. ¶ 19.

- Dr. Greifinger: "Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention[.]" Ex. D—Greifinger Dec. ¶ 13.

- Dr. Stern: "Downsizing jail populations by releasing high risk individuals and others the court system deems eligible for release will help to "flatten the curve" overall—both within the jail setting and without." Ex. A—Stern Dec. ¶ 11.

- Dr. Meyer, an Assistant Professor of Medicine at Yale School of Medicine: "Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large." Ex. F—Meyer Dec. ¶ 37.

---

[18] Available at https://www.bjs.gov/content/pub/pdf/pdmfdc9510.pdf.

13

Unless our detention practices change significantly, people will die.

### B. The Fifth Amendment Due Process Clause empowers the Court to release Mr. Otunyo for COVID-19-related reasons.

The Fifth Amendment Due Process Clause compels the Court to protect Mr. Otunyo from punitive conditions of confinement and ensure that he is afforded adequate medical care. A pretrial detainee's freedom from pretrial confinement is a fundamental right protected by the Due Process Clause; any government action infringing on this right must be narrowly tailored to achieve a compelling government interest. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

The constitutional protections of pretrial detainees arise under the Fifth Amendment Due Process Clause, which provides protection even greater than the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Eighth Amendment, which applies to persons convicted of criminal offenses, allows punishment as long as it is not cruel and unusual, but the Fifth Amendment's due process protections do not allow pretrial punishment at all. *Id.* Although the Government has an interest in detaining a defendant to secure their appearance at trial, Government may only subject a detainee "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37. In *Kingsley v. Hendrickson*, the Supreme Court affirmed the Due Process Clause's prohibition on pretrial punishment, and elaborated that "if the condition of confinement being challenged 'is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment.'" 135 S. Ct. 2466, 2470 (2015); *see also Doe v. Kelly,* 878 F.3d 710 (9th Cir. 2017) ("a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective").

14

In addition, pretrial detainees have a substantive due process interest in freedom from deliberate indifference to their medical needs. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Furthermore, in *Brown v. Plata*, the Supreme Court explained that a prisoner "may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." 563 U.S. 493, 510–11 (2011). While prisoner claims in *Brown v. Plata* arose under the Eighth Amendment, pretrial detainees likewise have the legal right to adequate medical care, given that their rights are at least as great as those of convicted persons being punished by imprisonment.

Mr. Otunyo has not yet received a sentence or final judgement in his case and is entitled to the protections that must be afforded to pretrial detainees. The current conditions of confinement create an unreasonable risk of exposure to COVID-19 and do not provide the necessary supplies for personal and environmental hygiene necessary to protect against contraction of the virus. Accordingly, in light of the extreme risk to Mr. Otunyo's health posed by the virus and the ever-increasing likelihood that he will contract it if he remains housed under current conditions, the conditions of his confinement are punitive, in violation of the Fifth Amendment. Release pending trial is appropriate to ensure his constitutional rights are protected and his life is not further jeopardized during this crisis.

### C. The Eighth Amendment empowers the Court to release Mr. Otunyo for COVID-19 related reasons.

The Eighth Amendment prohibition against cruel and unusual punishment also compels release under the current extraordinary circumstances. The government, in detaining defendants pretrial, must take sufficient protective measures to prevent contraction of COVID-19 in the jail population. Unreasonable risk of COVID-19 contraction will, in itself, constitute an Eighth

Amendment violation.

The Supreme Court has held that exposure to environmental threats to an incarcerated person's physical wellbeing where exposure is preventable could constitute a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 28 (1993).  In *Helling,* a plaintiff alleged that he was assigned to a cell with another inmate who smoked five packs of cigarettes per day. *See Id*. at 28.  At issue was whether this exposure to environmental tobacco smoke (ETS) could constitute a valid claim under the Eighth Amendment, even though the plaintiff had not yet suffered harm. *Id.* at 30.  The Supreme Court upheld the decision of the Court of Appeals, finding that the plaintiff stated "a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Id.* at 35.  "Though *Helling* directly addressed an inmate's exposure to [secondhand smoke], it tacitly acknowledged other situations in which environmental factors can pose an unreasonable risk to an inmate's health, including exposure to 'infectious maladies such as hepatitis and venereal disease' caused by overcrowding, unsafe drinking water, and 'toxic or other substances." *Allen v. Kramer*, 2016 WL 4613360, at *7 (E.D. Cal. Aug. 17, 2016) (quoting *Helling*, 509 U.S. at 33, 35.)

The Ninth Circuit has applied *Helling* to exposure to asbestos finding it was "uncontroverted that asbestos poses a serious risk to human health" and the plaintiff "proffered specific evidence showing that the defendants knew of the existence of and dangers posed by asbestos." *Wallis v. Baldwin* 70 F.3d 1074 (9th Cir. 1995).  *Helling* has also been applied to "contagious diseases caused by overcrowding conditions, *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004); contaminated water, *Carroll v. DeTella*, 255 F.3d 470, 472

16

(7th Cir. 2001); compelled use of chemical toilets, *Masonoff v. DuBois*, 899 F. Supp. 782, 797 (D. Mass. Sep. 11, 1995), [and] paint toxins, *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 325 (W.D.N.Y. 1999)." *Allen*, 2016 WL 4613360, at *8.

Perhaps most applicable to COVID-19, a number of cases have applied *Helling* to the exposure of inmates to Valley Fever in California. Relying on *Helling*, *Allen v. Kramer* concluded that an inmate plaintiff had alleged an Eighth Amendment violation because he was housed in the Central Valley where there was a relatively high risk of contracting Valley Fever. *See Allen*, 2016 WL 4613360, at *1, 11. *Shabazz* adopted *Allen*'s reasoning and came to the same conclusion. *Shabazz v. Beard*, 2018 WL 1071173, at *7-9 (E.D. Cal. Feb. 27, 2018); *see also Jackson v. California,* 2014 U.S. Dist. LEXIS 22966, at *32-38 (E.D. Cal. Feb. 20, 2014) (overruled on other grounds in *Hines v. Youseff*, 914 F.3d 1218, 1231 (9th Cir. 2019) (explicitly declining to reach Eighth Amendment question but reversing on fact-specific finding of qualified immunity)).

The reasoning of *Allen v. Kramer*, *Shabazz v. Beard*, and *Jackson v. California*, and other cases applying *Helling* to exposure to environmental risks applies with equal or greater force to COVID-19, and establishes that officials who fail to adequately protect inmates from the risk of contracting COVID-19 violate the Eighth Amendment. Where protections from COVID-19 for incarcerated clients are insufficient, as in this case, whether for the jail population as a whole or for particularly at-risk individuals, release is constitutionally mandated.

The DC Jail is unable to adequately protect Mr. Otunyo from contracting the virus, and more importantly, places him at a heightened risk of exposure due to the environmental conditions. His continued detention under these conditions violates the Eighth Amendment and necessitates his immediately release pending containment of the virus.

17

### D. Strict conditions will protect the public from Mr. Otunyo.

Importantly, strict conditions of release are available for Mr. Otunyo's supervision between now and his trial. Mr. Otunyo will be supervised by Pretrial Services and can be placed on ankle monitoring and home detention. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[19]

Mr. Otunyo was scheduled for a pretrial conference on April 10, 2020, and for trial on May 4, 2020. However, on March 17, 2020, pursuant to the Court's Standing Order 20-9 ¶ 3,4 the Court vacated both dates, and the parties are scheduled to appear telephonically on May 1, 2020. For all of the reasons stated above, Mr. Otunyo respectfully asks for release on strict conditions, including ankle monitoring and home detention. This is the only way to promote public health, protect Mr. Otunyo, and ensure that his constitutional rights are respected during this emergency.

## CONCLUSION

For the reasons stated here, Mr. Otunyo must be released.

Respectfully submitted,

_____/s/_____

Brandi Harden
Bar No. 470706
Counsel for Kelvin Otunyo
Harden|Pinckney, PLLC
400 7th Street Suite 604
Washington, DC 20004
*hardenpinckney@gmail.com*
(202) 390-0374

---

[19] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Defendant's Emergency Motion for Release From Custody Due To Immediate Threat Posed by COVID-19 Pandemic has been served via electronic case filing to Christopher Brown and Charles Willoughby, Assistant United States Attorneys, United States Attorney's Office, 555 4th Street, NW, Washington, D.C. 20530, on this 8th day of April 2020.

_____/s/_____
Brandi Harden
Bar No. 470706
Counsel for Kelvin Otunyo
Harden|Pinckney, PLLC
400 7th Street Suite 604
Washington, DC 20004
hardenpinckney@gmail.com
(202) 390-0374