# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 18-251 (BAH) |
| KELVIN OTUNYO, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Almost twenty months ago, at the time of his arrest and initial appearance, in August 2018, on initial charges of Bank Fraud and Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1344(2) and 1028A(a)(1), defendant Kelvin Otunyo—a Nigerian citizen with a prior felony conviction and no legal status in the United States—conceded detention, without written findings. Min. Entry (Aug. 31, 2018); *see also* Def.'s Reply to Gov't's Opp'n to Def.'s Mot. ("Def.'s First Reply") at 2, ECF No. 32 (acknowledging that defendant had "conceded detention and waived written findings in this case"). Now, he has filed an Emergency Motion for Release from Custody Due to Immediate Threat Posed by COVID-19 Pandemic ("Def.'s Mot."), ECF No. 30, and asks the Court to "reconsider [the detention] decision pursuant to 18 U.S.C. § 3142, and . . . issue written findings," Def.'s First Reply at 2, but never specifies the precise subsection of § 3142 on which he relies, *see generally* Def.'s Mot. Based upon the findings set out below, the Court concludes, after consideration of the record, arguments presented by the parties in their submissions both before and after a hearing held on April 20, 2020, as well as the factors enumerated in 18 U.S.C. § 3142(g), that no condition or combination of conditions will

reasonably assure defendant's appearance as required and the safety of the community.[1]

Consequently, defendant must be detained under 18 U.S.C. § 3142(e)(1).  Further, temporary

release, under 18 U.S.C. § 3142(i), should not be permitted, despite the current circumstances

presented by the ongoing COVID-19 pandemic, nor do defendant's constitutional claims require

his release.  Defendant's motion is therefore denied.

## I.      BACKGROUND

Defendant currently faces five charges for Bank Fraud (Counts One and Two),

Aggravated Identity Theft (Count Three), and Conspiracy to Launder Monetary Instruments

(Counts Four and Five), in violation of 18 U.S.C. §§ 1344(2), 1028A(a)(1), 1956(a)(1)(B)(i), (h),

and 1957.  Superseding Indictment, ECF No. 17.  As alleged in the Superseding Indictment,

during the period of about August 2017 through July 2018, just shortly before his arrest,

defendant engaged in multiple criminal schemes using sophisticated means and at least nine co-

conspirators, who were allegedly recruited and instructed by defendant, to assist in stealing

money from multiple victims.  Specifically, for the bank fraud and aggravated identity theft

charges, in Counts One through Three, the government alleges that, from about May to July 31,

2018, defendant recruited and supervised Person A in establishing a false identity, complete with

a fraudulent driver's license and stolen Social Security Number from an identity theft victim, to

create two fraudulent shell companies named "Contract Supply LLC" and "O-I Packaging

Solutions LLC," open corresponding bank accounts, and deposit, on July 30, 2018, a stolen

check in the amount of $34,957.50 payable to "Contract Supply" into the account of the shell

---

[1]       Following the hearing on April 20, 2020, the parties submitted supplemental filings regarding the effect, if any, on consideration of defendant's motion of an immigration detainer lodged against defendant, as well as regarding defendant's newly raised arguments concerning restrictions on his ability to communicate with his counsel during the current global pandemic.  *See* Apr. 20, 2020 Draft Hr'g Tr. at 34:18–24, 36:7–25.  Supplemental briefing was completed on April 24, 2020. *See* Gov't's Resp. to Min. Order Regarding Immigration Detainer ("Gov't's Resp. to Min. Order") at 1, ECF No. 40.

company with the similar name at BB&T Corporation, and attempt to deposit, on July 31, 2018, a stolen check in the amount of $17,579.94 payable to "O-I Packagin [sic] Solutions" in the account of the shell company with the similar name at Woodforest National Bank. *Id*. ¶¶ 9–28. "Woodforest National Bank declined to accept the deposit of the above-referenced stolen check in the amount of $17,579.94." *Id*. ¶ 24.

For the money laundering conspiracy charges in Counts Four and Five, the government alleges that, from about August 2017 through July 2018, defendant, with Co-Conspirators A, B, C, D, E, F, G, and H, engaged in four separate schemes to launder the proceeds of seven stolen and unauthorized checks, totaling over $303,200.00, from multiple victims. *Id*. ¶¶ 29–71. To carry out these schemes, defendant and his co-conspirators used false aliases to create shell companies with similar names to intended payees on stolen and unauthorized checks, and to establish bank accounts for the shell companies. *Id*. ¶¶ 32(a)–(b), (d), 45(a)–(b), (d). After the stolen checks were deposited into the shell companies' accounts, defendant and his co-conspirators "would and did rapidly drain" the bank accounts containing the proceeds of the stolen and unauthorized checks. *Id*. ¶¶ 32(c), 45(c).

In Scheme 1, defendant allegedly used a false alias to create a Maryland shell company named "Due South Concrete LLC," with a SunTrust bank account, into which account three stolen checks payable to "Due South Concrete LLC" in the separate amounts of $24,153.42, $26,200.00, and $22,400.96 were deposited, in September and October 2017. *Id*. ¶¶ 34–38. Defendant, with the assistance of Co-Conspirator D, caused funds to be withdrawn from this account and checks to be issued with the stolen funds from the account to Co-Conspirators A, B, and C. *Id*. ¶¶ 38–41. In Scheme 2, defendant and Co-Conspirator F, who was instructed by defendant, allegedly used false aliases to establish two accounts at First National Bank of

Pennsylvania in the names of shell companies "United Petroleum Transport LLC" and "Novotel Medical Supply, LLC" and, with the further involvement of Co-Conspirators E, G, and H, deposited two stolen or unauthorized checks payable to "Novotel Medical Supply LLC" in the separate amounts of $41,322.75 and $35,870.00 into one of the two accounts, from which funds were removed via internet transfers, debit transactions, cash withdrawals, and checks issued to co-conspirators, to the other fraudulent account, and to an account in the name of the company "Salvage Auto Exporters LLC." *Id.* ¶¶ 47–63. In Schemes 3 and 4, defendant allegedly received from Co-Conspirator E images of two stolen checks payable to "Toyo Ink America LLC" and "Dometic Corporation," in the amounts of $77,761.39 and $75,499.33, respectively. *Id.* ¶ 65. Then defendant and Co-Conspirator F, who was instructed by defendant, used false aliases to establish Maryland corporations and associated bank accounts in the names of the payees of the stolen checks, into which fraudulent accounts the two stolen checks were deposited on June 26, 2018. *Id.* ¶¶ 66–71. Defendant allegedly made cash withdrawals from one of the fraudulent accounts, *id.* ¶ 70(c), and directed Co-Conspirator F "to conduct a number of debit transactions and cash withdrawals" from the other fraudulent account, *id.* ¶ 71(c).

The government alleges that defendant and his co-conspirators in the charged bank fraud and money laundering schemes "would and did communicate with each other about the conspiracy by using encrypted means of communications, in particular, the messaging application 'WhatsApp.'" *Id.* ¶¶ 32(e), 45(e); *see also id.* ¶¶ 11, 21.[2] Indeed, the evidence the government has proffered against defendant includes, in addition to bank records, nearly 3,400 WhatsApp messages sent to and from defendant's phone, in which messages defendant appears

---

[2] As the government explains, "WhatsApp is [a] messaging application for cell phones that allows users to exchange text, pictures, and other media. By default, WhatsApp messages are encrypted using end-to-end encryption." Gov't Mem. Supp. Pretrial Det. ("Gov't's Det. Mem.") at 2 n.2, ECF No. 6.

to document not only some of the illegal conduct underlying his charges in this case, but also his involvement in other illicit activities.  *See* Gov't's Opp'n Def.'s Mot. ("Gov't's Opp'n") at 6 & n.2, 7–8, ECF No. 31; *see also, e.g.*, Gov't's Exs. 1, 2, ECF Nos. 31-1, 31-2.

## II.   LEGAL STANDARD

The Bail Reform Act ("BRA") requires release of a defendant prior to trial unless a judicial officer determines, after a hearing, that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).  In making this determination, the court must "take into account the available information concerning" four factors set out in 18 U.S.C. § 3142(g).  These factors are: "(1) the nature and circumstances of the offense charged . . . ; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . . (4) the nature and seriousness of the danger to . . . the community that would be posed by the person's release." 18 U.S.C. § 3142(g).  When detention is ordered to protect the safety of the community, the BRA requires the finding to be supported by "clear and convincing evidence," *id*. § 3142(f), and, while the BRA is "silent as to the level of proof required to establish risk of flight," the D.C. Circuit "has ruled that such a finding need only be supported by a 'preponderance of the evidence,'" *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) (citing *United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986)); *see also United States v. Manafort*, 897 F.3d 340, 344 n.1 (D.C. Cir. 2018).  The BRA makes clear that "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the

presentation and consideration of information at [a detention] hearing," 18 U.S.C. § 3142(f), and

the government is permitted "to proceed by way of proffer," *United States v. Smith*, 79 F.3d

1208, 1209 (D.C. Cir. 1996) (per curiam).

Notwithstanding a defendant's pretrial detention pursuant to 18 U.S.C. § 3142(e)(1), a

"judicial officer may, by subsequent order, permit the temporary release of the person, in the

custody of a United States marshal or another appropriate person, to the extent that the judicial

officer determines such release to be necessary for preparation of the person's defense or for

another compelling reason." 18 U.S.C. § 3142(i). Section 3142(i) "provides a distinct

mechanism for temporarily releasing a detained defendant, in a manner that has nothing to do

with a revisiting of the initial detention determination," *United States v. Lee*, 19-cr-298 (KBJ),

2020 WL 1541049, at *3 (D.D.C. Mar. 30, 2020), but "[a] defendant has the burden of showing

that temporary release is 'necessary,'" *id.* (alteration in original) (internal quotation marks

omitted) (quoting *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y.

Mar. 19, 2020)).

## III.   DISCUSSION

Defendant, who is detained at a D.C. Department of Corrections ("DOC") facility, moves

for immediate release, under 18 U.S.C. § 3142, and the Fifth and Eight Amendments to the

United States Constitution, Def.'s Mot. at 1, due to the health risks posed by COVID-19. He

asserts that the most important steps to guard against the spread of this virus, namely, "good

hygiene and social distance," "are nearly impossible at the DC Jail," *id.* at 3; *see also id.* at 4–14,

and that he "is charged with a non-violent offense, is not a flight risk, and any concerns could be

addressed by home detention and GPS monitoring," *id.* at 4; *see also id.* at 18. Other than these

cited reasons, defendant does not dwell on the specifics of the charges, the § 3142(g) factors, or the § 3142(i) requirements.

In assessing defendant's motion, the § 3142(g) factors are addressed first, followed by consideration of § 3142(i) and, finally, defendant's constitutional claims.

### A.    The § 3142(g) Factors Strongly Favor Detention

Consideration of the factors prescribed in 18 U.S.C. § 3142(g) requires continued detention of defendant.  These factors, and the findings that underpin each one, are discussed *seriatim*.

### 1.    *The Nature and Circumstances of the Offenses*

First, the nature and circumstances of defendant's offenses weigh strongly in favor of pretrial detention. 18 U.S.C. § 3142(g)(1).  Defendant is charged with a repeated and complex pattern of fraud, identity theft, and money laundering involving at least nine co-conspirators and the creation of "shell corporations, fraudulent bank accounts, and the establishment of . . . fraudulent alias[es]," including via the use of "the name and stolen Social Security Number of a person."  Gov't Det. Mem. at 5.  "Each scheme involved some variation on the same pattern: defendant and co-conspirators would establish fraudulent shell corporations, open fraudulent bank accounts using false identification, deposit the stolen or unauthorized checks, and then launder or attempt to launder the resulting proceeds."  Gov't Notice & Mot. to Admit Other Crimes Evidence & Notice of Intent to Introduce Prior Conviction for Impeachment Purposes ("Gov't 404(b) Mot.") at 1–2, ECF No. 24.

The government provides strong evidence that defendant procured false identification documents and used fraudulent aliases in furtherance of his crimes.  *See, e.g.*, Ex. A., Gov't Det. Mem., at 1–2, ECF No. 6-1 (images of fraudulent New Jersey and Pennsylvania driver's

licenses bearing defendant's photograph).  This evidence, in turn, raises the serious concern that

defendant has the knowledge and ability to create and assume a new identity to escape

prosecution if released, even temporarily.  *See, e.g.*, *Vortis*, 785 F.2d at 328 (citing defendant's

possession of "thirteen United States passports and other forms of identification for persons other

than [defendant]" in support of detention); *United States v. Bikundi*, 47 F. Supp. 3d 131, 134–35

(D.D.C. 2014) (citing in support of detention the defendant's "sophistication" in "set[ting] up

several companies" used in the offense, *id.* at 134, as well as the defendant's participation in

"complex" fraud, *id.* at 135).

Moreover, the circumstances of the offense reveal that defendant took elaborate steps to

conceal his own role in the fraud schemes, including by recruiting others to assist, and creating

the false identification documents, shell companies, and fraudulent accounts described above.

Gov't Det. Mem. at 5.   The government has also proffered evidence of numerous statements

made by defendant not only demonstrating that he understood his activities to be illicit, but also

instructing a co-conspirator: "[d]on't say nothing" if questioned by authorities.  *Id.*

Reflecting the seriousness of the charges against defendant is the significant period of

incarceration provided for each charge.  Defendant faces up to thirty years of imprisonment for

the bank fraud counts, in violation of 18 U.S.C. § 1344(2), up to twenty years imprisonment on

the money laundering conspiracy charges, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (h) and

1957, and a statutory fixed *consecutive* term of imprisonment of two years for the aggravated

identity theft count, in violation of 18 U.S.C. § 1028A(a)(1).  By the government's uncontested

estimation under the U.S. Sentencing Commission Guidelines Manual, defendant faces a

guidelines' sentencing range of up to 11 years in prison if convicted of the current charges.  *See*

Gov't's Opp'n at 6–7 & nn.4–5.  Defendant, who is not a U.S. citizen and has strong ties to

Nigeria, thus has a substantial incentive to flee if released.

For all these reasons, the nature and circumstances of the offenses strongly favor

detention.

### 2. *The Weight of the Evidence Against Defendant*

Second, the overwhelming evidence against defendant also strongly favors detention.  18

U.S.C. § 3142(g)(2).  The government has substantial evidence supporting the charges against

defendant, including "financial records of the [relevant] transactions, incriminating WhatsApp

chat records involving the Defendant, audio recordings in which the Defendant discusses the

indicted scheme (and others) in detail, and surveillance of the Defendant while engaged in the

criminal scheme."  Gov't's Det. Mem. at 6–7.  For instance, the government attached to its initial

detention memorandum images of *fourteen* false identifications and bank cards found in

defendant's home and vehicles, including, as previously noted, a fraudulent New Jersey driver's

license and a fraudulent Pennsylvania driver's license, both bearing defendant's photograph.  *See*

Ex. A at 1–2, Gov't's Det. Mem.

Since defendant's initial detention in this case, the government has obtained additional

evidence, in the form of nearly 3,400 WhatsApp messages sent to and from defendant's phone,

which combined with the previously obtained WhatsApp chat records, "contain[] evidence of . . .

the charged offenses as well as other, similar conduct related to additional financial fraud

schemes, the creation and use of fraudulent shell corporations or accounts, and the use of false

and stolen identities."  Gov't's 404(b) Mot. at 5.  Indeed, the government represents that "[i]n

these WhatsApp chats, the Defendant extensively documented his own schemes."  Gov't's

Opp'n at 7.

For example, in about May 2018, defendant requested and received via WhatsApp a photograph from co-conspirator Person A to create a fictitious identification document. Superseding Indictment ¶ 11.  Then, on about July 30, 2018, Person A sent defendant an image of a checkbook for a fraudulently opened account.  *Id.* ¶ 21.  Similarly, on about October 20, 2017, Co-Conspirator D sent defendant, via WhatsApp, a Wells Fargo bank account number, into which account defendant subsequently transferred fraudulently obtained funds, as established by a photograph defendant sent to Co-Conspirator D via WhatsApp later the same day, showing the deposit had been made.  *Id.* ¶¶ 39–41.

A series of WhatsApp exchanges from November 2017—between defendant and Co-Conspirators E and F—are especially incriminating.  *See* Gov't's Ex. 1 at 2 (transcript of November 2017 exchanges).  Beginning on about November 2, 2017, Co-Conspirator E sent defendant a photograph of a check from a California municipality to a California public utility company.  Superseding Indictment ¶ 48.  Then, on about November 6, 2018, defendant responded to Co-Conspirator E, saying that the "name" would be "difficult to open," so perhaps someone should "clean" the check.  *Id.* ¶¶ 48–49.  Also, on about November 6, 2018, defendant sent a message to Co-Conspirator F containing the name of a false alias, a birthdate, and an address.  *Id.* ¶ 50.  On about November 9, 2019, defendant told Co-Conspirator E: "I Dey On My way to register and open, Novotel medical supply Llc."  *Id.* ¶ 51.  That same day, defendant sent to Co-Conspirator F information about "Novotel Medical Supply," including the company's name and purpose, writing: "You basically supply medical equipments to group homes and other facilities."  *Id.* ¶ 52.  Defendant also told Co-Conspirator F to obtain a Tax Identification Number for "Novotel Medical Supply," instructing Co-Conspirator F not to use his personal computer when doing so, and instead to use a public computer at a library or FedEx.  *Id.* ¶ 53.  On about

November 16, 2017, defendant messaged Co-Conspirator F to "send me pic of the check and ein," to which Co-Conspirator F replied by providing photographs of blank checks for bank accounts opened in the name of a false alias, as well as a photograph of an IRS letter assigning an Employment Identification Number ("EIN") to "Novotel Medical Supply LLC." *Id.* ¶ 56. Then, defendant sent two of the photographs he received from Co-Conspirator F—a photograph of one of the blank checks, and the photograph of the EIN letter—to Co-Conspirator E, who responded: "Got u, I 4wrd it, hopefully I'll mail out on Saturday or Monday." *Id.* ¶ 57. Finally, on about November 20, 2018, defendant sent Co-Conspirator E a photograph of a slip showing the deposit of a fraudulent check payable to "Novotel Medical Supply LLC" into one of the bank accounts referenced in defendant's November 16, 2017 messages with Co-Conspirator F. *Id.* ¶ 59.

These communications among defendant and his co-conspirators lay bare the illicit nature of the fraudulent and money laundering activities in which they were allegedly engaged. Their own words will be further corroborated, according to the government, by the live testimony at trial of "one or more of the Defendant's associates, who participated in the Defendant's criminal schemes with him," Gov't Opp'n at 7, putting the cherry on top of the government's substantial and compelling pile of evidence. In short, the strength of the evidence provides defendant with further reason to attempt to flee if released, and thus this factor also strongly favors detention.

### 3.   *The History and Characteristics of Defendant*

Third, defendant's history and characteristics, 18 U.S.C. § 3142(g)(3), weigh on the side of detention. As noted, the government indicates that "the events charged in the indictment represent just one example of an ongoing pattern of illegal fraud and identity theft activity by the Defendant." Gov't Det. Mem. at 8. For instance, in support of its initial detention

memorandum, the government attached surveillance photographs that implicate defendant in a fraud and money laundering scheme in January and February 2017 involving an individual, Michael Afram Orji, who subsequently pleaded guilty in this Court to bank fraud and money laundering charges.  *See* Exs. F, G, Gov't's Det. Mem., ECF Nos. 6-6, 6-7; *see also United States v. Orji*, No. 18-cr-68 (BAH) (D.D.C.).

Further, this is not defendant's first interaction with the criminal justice system.  In 2012, defendant was arrested on multiple New York state charges, including Identity Theft in the First Degree.  Gov't Det. Mem. at 8.  In 2013, defendant pleaded guilty to Criminal Possession of Stolen Property in the Third Degree and was sentenced to five years' probation, which sentence defendant was still serving when he committed much of the charged conduct.  *Id.* at 8–9; Gov't Opp'n at 8.  Indeed, defendant acknowledges, in one WhatsApp exchange proffered by the government, the risk of engaging in criminal conduct due to his probation status, yet he still went forward with the activities giving rise to the current charges.  *See* Gov't Ex. 2 at 2 ("Iv been trying to control myself bro / I Dey take all these risk while on probation").  Defendant has thus demonstrated a willful disregard of and failure to comply with court orders.  *See* 18 U.S.C. § 3142(g)(3)(B) (directing the court to consider "whether, at the time of the current offense or arrest, the person was on probation . . . for an offense under Federal, State, or local law").

Meanwhile, defendant's ties to the community are weak.  He identifies only a single family member in the United States: his sister, who has been in this country for three years and is a lawful permanent resident living in Pennsylvania.  *See* Def.'s First Reply at 6; Apr. 24, 2020 Pretrial Services Status Report at 2, ECF No. 41.  Defendant is a non-citizen with limited legitimate employment history.  Indeed, defendant's Permanent Residence Card and Employment Authorization Card expired in 2010 and 2009, respectively, *see* Ex. C, Gov't Det.

Mem., ECF No. 6-3, and consequently, his legal employment prospects here are limited to none. For these reasons, this factor weighs heavily in favor of detention.[3]

### 4.      *The Nature and Seriousness of the Danger Posed by Defendant's Release*

As to the final factor, the danger defendant presents to the community also supports detention.  *See* 18 U.S.C. § 3142(g)(4).  Although defendant is charged with non-violent offenses, his alleged illicit activities nevertheless resulted in financial (and potentially reputational) harm to multiple victims.  Due to the expiration of his Employment Authorization Card, if released, defendant has few, if any, options available for making a legitimate livelihood. These circumstances raise significant concern that defendant's release will put the public at risk of defendant's resumption of fraud-related activity, as allegedly occurred while defendant was on probation for a conviction arising from similar conduct.  This factor thus favors detention.[4]

\* \* \*

In sum, each of the § 3142(g) factors weighs heavily on the side of pretrial detention and supports the conclusion that defendant is a serious flight risk and poses a danger to the community, requiring his detention prior to trial.

---

[3]      The government initially argued that a pending immigration detainer lodged by U.S. Immigration and Customs Enforcement ("ICE") against defendant warranted his continued pretrial detention since "releasing the Defendant from DOC custody will accomplish little if he is surrendered into ICE custody upon release from D.C. Jail."  Gov't Resp. to Def.'s Suppl. Mem. ("Gov't Suppl. Resp.") at 5, ECF No. 39.  Subsequently, however, the government reported that it "understands that ICE now intends to lift the Immigration Detainer."  Gov't Resp. to Min. Order at 1.  Nonetheless, even without a detainer, defendant's immigration status and ties to this country are relevant in considering defendant's history and characteristics.  *See* 18 U.S.C. § 3142(g)(3)(A) (citing, as relevant, "the person's . . . family ties, employment, . . . length of residence in the community, [and] community ties").

[4]      The government expects one or more of the defendant's associates to testify against him at trial and expresses concern that defendant, if released, may attempt to threaten or intimidate those he suspects will testify against him.  Gov't Opp'n at 10.  As support, the government points out that defendant, in a WhatsApp chat, told a co-conspirator that he "just no wan kill person because of Lil money bro but that shit really hurt," Gov't Ex. 2 at 2, and later defendant added (referring either to the same person or to a different person who also owed him money): "I have her address and phone number now and I can really track her down if I wanted to," *id.* at 3.  These statements are too inconclusive to support a finding that defendant poses a physical threat to potential witnesses.

### 5.      *The Ongoing COVID-19 Pandemic Does Not Alter the Analysis*

Defendant urges the Court to consider the current public health crisis presented by the

ongoing COVID-19 pandemic.  *See generally* Def.'s Mot.; *see also* Def.'s First Reply at 1–2, 8–

11.  The risk presented by the pandemic is clearly serious, and the Court acknowledges that this

risk is greater in a detention environment where inmates are housed in close proximity to one

another.  *See Banks v. Booth*, No. 20-cv-849 (CKK), 2020 WL 1914896, at *6 (Apr. 19, 2020)

("It is undisputed that, as of April 4, 2020, the infection rate at DOC facilities was over seven

times the infection rate of the District of Columbia at large.").  The government points out that

DOC has devised precautions to prevent the spread of the virus within the facility where

defendant is detained, Gov't's Opp'n at 11–12, including suspension of all in-person visits,

programming, and volunteer activities within its facilities; enhanced cleaning efforts, especially

within common areas; restrictions on movement of inmates; and vigilant medical personnel on

alert for symptoms and prepared to isolate and treat symptomatic residents, *see* D.C. Department

of Corrections Notice, Updated: April 4, 2020, *available at* https://doc.dc.gov/page/coronavirus-

prevention; *see also* Gov't's Opp'n at 11–12 (detailing additional precautions taken by DOC).  A

recent decision from this Court in *Banks v. Booth* casts doubt on the effectiveness of these

precautions, however, since the *Banks* court found deficient conditions in DOC's facilities.  *See*

2020 WL 1914896, at *6–8.  Although the *Banks* court did not order a general release of

prisoners, *see id.* at *13, DOC conditions, as documented in a thorough inspection report

prepared by an independent third-party, prompted issuance of a Temporary Restraining Order

("TRO") requiring DOC to undertake immediate remedial measures to prevent the further spread

of COVID-19 within DOC facilities, including, *inter alia*, (1) expediting "the triage process

associated with sick call requests on [] non-quarantine units," *id.*; (2) conducting "additional staff

training on the use of . . . non-touch, infrared thermometers," *id*. at *14; (3) taking "immediate steps to provide consistent and reliable access to legal calls, personal telephone calls, daily showers, and clean clothing and clean linens to all inmates on isolation status," *id*.; (4) ensuring "appropriate and consistent implementation of social distancing policies by addressing limitations in current staffing levels," *id*.; and (5) making sure "that all PPE issued is properly fitted" and that "all DOC staff receive instruction on the proper disposal of PPE," *id*.

DOC is taking steps to comply with these directives, *see* Gov't's Suppl. Resp. at 7, so the *Banks* decision, standing alone, does not justify defendant's release from detention at this time. Indeed, the Court retains an independent responsibility to assess the individualized circumstances of this case in light of the statutory requirements of the Bail Reform Act, and courts in this district have continued to deny emergency motions for release since the issuance of the *Banks* TRO when individualized circumstances continue to require detention. *See, e.g.*, Mem. Op. & Order, *United States v. Jones*, No. 19-cr-232 (EGS) (D.D.C. Apr. 23, 2020). Moreover, defendant has not pointed to any underlying health condition making him particularly susceptible to the virus.

As a general matter, the current COVID-19 pandemic is a poor fit for the § 3142(g) analysis. *See United States v. Sagastume-Galicia*, No. 20-cr-40 (BAH), 2020 WL 1935555, at *5 (D.D.C. Apr. 22, 2020) ("[T]he threat of a pandemic does not fit neatly into one of the factors courts must consider under section 3142(g) . . . ."); *Lee*, 2020 WL 1541049, at *4 ("[T]his Court doubts that the COVID-19 pandemic has *any* material impact on the section 3142(g) factors that led [the magistrate judge] to determine that pretrial detention was warranted in [the defendant's] case." (emphasis in original)). Rather, the more natural mechanism for raising defendant's concerns is § 3142(i), which, as addressed next, allows for "temporary release" of a defendant

for a "compelling reason."  18 U.S.C. § 3142(i); *see United States v. Thomas*, No. 17-cr-194

(RDM), 2020 WL 1911558, at *7 (D.D.C. Apr. 20, 2020) ("[The defendant's] motion should be

resolved under § 3142(i), which is better tailored to the present circumstances."); *Lee*, 2020 WL

1541049, at *3 ("By contrast, section 3142(i) provides a distinct mechanism for temporarily

releasing a detained defendant, in a manner that has nothing to do with a revisiting of the initial

detention determination.").  This additional consideration further bolsters the conclusion that the

COVID-19 pandemic does not alter the § 3142(g) analysis above.

* * *

For the foregoing reasons, the BRA requires that defendant be detained prior to trial.

**B.**    **Temporary Release Will Not Be Permitted Under 18 U.S.C. § 3142(i)**

Defendant has also sought temporary release pursuant to 18 U.S.C. § 3142(i).  *See* Apr.

20, 2020 Draft Hr'g Tr. ("Draft Hr'g Tr.") at 14:5–11, 15:18–20, 33:3–4, 13–17.  Under this

statutory provision, a defendant otherwise subject to pretrial detention may be granted temporary

release by showing both (1) that he would be released to an "appropriate person," and (2) that the

temporary release is "necessary for preparation of the person's defense or for another compelling

reason."  18 U.S.C. § 3142(i); *see Lee*, 2020 WL 1541049, at *3, *7; *United States v. Armstead*,

Nos. 19-cr-00369 (APM), 18-cr-00357 (APM), 2020 WL 1821130, at *1 (D.D.C. Apr. 10,

2020).  In assessing both statutory elements for exercise of the discretion inherent in § 3142(i),

the Court must be mindful of the factors set out in 18 U.S.C. § 3142(g).  Whether a third-party

custodian is "appropriate" for a particular defendant, and whether the reason for release is

"compelling" and makes release "necessary," under § 3142(i), turns on the seriousness and

circumstances of the offense charged, defendant's criminal history and characteristics, and "the

nature and seriousness of the danger to any person or the community that would be posed by the

person's release," 18 U.S.C. § 3142(g)(4), even on a temporary basis. *See Thomas*, 2020 WL 1911558, at *7 ("[T]he § 3142(g) factors . . . inform the Court's consideration of whether 'compelling reasons' justify [a defendant's] temporary release.").

In this instance, defendant has satisfied neither statutory element.

### 1.    *Defendant Has Not Provided an Appropriate Third-Party Custodian*

Defendant has proposed his release to home confinement in the custody of his sister, who lives in Pennsylvania. In appropriate circumstances, a defendant may be temporarily released to the custody of a family member pursuant to § 3142(i). *See Thomas*, 2020 WL 1911558, at *8 ("The 'case law suggests that family members may constitute "appropriate persons" where the defendant is released to relatives and placed under house arrest.'" (quoting *Stephens*, 2020 WL 1295155, at *7)); *see also United States v. Dhavale*, No. 19-mj-00092, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020) (releasing defendant into custody of his wife under § 3142(i)). *But see United States v. Leake*, No. 19-cr-194 (KBJ), 2020 WL 1905150, at *4 (D.D.C. Apr. 17, 2020) ("[B]ased on the plain text of section 3142(i) and the *noscitur a sociis* canon, there is ample reason to doubt that Congress intended for 'another appropriate person' to be anyone other than a law enforcement officer."). Yet, an "appropriate person" under § 3142(i), must, at a minimum, meet the qualifications for a designated third-party custodian, who must "agree[] to assume supervision and to report any violation of a release condition" and be "able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community," 18 U.S.C. § 3142(c)(1)(B)(i), and, further, must be "'appropriate' in terms of actually being qualified to be given such responsibility," *Leake*, 2020 WL 1905150, at *4.

Here, defendant's sister possesses certain characteristics for a suitable custodian, such as maintaining stable employment and owning a home in which defendant may be confined. *See* Apr. 24, 2020 Pretrial Services Status Report at 2. Yet, defendant's sister, having lived here for only three years, does not have long-standing ties to the United States, and her immigration status will expire on May 15, 2020. *See id.*; *see also* Gov't's Suppl. Resp. at 5. Most importantly, even with the current global pandemic, defendant's sister must spend over forty hours outside of her home each week, as she is an essential worker under the terms of Pennsylvania's current stay-at-home order. *See* Apr. 24, 2020 Pretrial Services Status Report at 2 (noting that defendant's sister's husband is also an essential worker who must be outside of the home more than forty hours per week). Accordingly, defendant's sister is not in a position to monitor defendant on a continuous basis and ensure against him either fleeing or recidivating. *Cf. Dhavale*, 2020 WL 1935544, at *5 (determining that defendant's wife was appropriate third-party custodian when she could "provide essentially round-the-clock monitoring of defendant upon his release to home detention in her custody"). In light of these facts, defendant has failed to establish that his sister is an appropriate custodian under § 3142(i).

### 2. *Defendant Has Not Presented a Compelling Reason for Temporary Release*

Turning to the other statutory element, under 18 U.S.C. § 3142(i), defendant claims that his release is necessary both due to the general health concerns presented by the COVID-19 pandemic and to facilitate his trial preparations. Neither asserted basis for temporary release is sufficiently compelling.

First, as decisions from this Court have now repeatedly recognized, the ongoing pandemic, on its own, does not justify temporary release under § 3142(i). *See, e.g.*, *Dhavale*, 2020 WL 1935544, at *6; *Thomas*, 2020 WL 1911558, at *7; *Lee*, 2020 WL 1541049, at *6.

Rather, § 3142(i) typically requires a defendant to present "individualized reasons for why release would be necessary in his particular case." *Lee*, 2020 WL 1541049, at *6. Here, defendant points to no underlying medical conditions or other health considerations that pertain particularly to him, and his argument for temporary release on general health risk grounds therefore fails.

Second, the current limitations on defendant's ability to communicate with counsel do not justify release. Defendant has pointed to troubling restrictions on his legal communications. DOC has set up a new telephone protocol for scheduling, via email, attorney calls between private defense attorneys and their detained clients while COVID-19 restrictions are in effect. *See* Def.'s Suppl. Emergency Request to Release from Custody ("Def.'s Suppl. Request") at 8, ECF No. 38.[5] Defendant, however, claims that his defense attorney receives error messages when she emails the relevant DOC email account and, "[t]o date, [he] has not received *one* telephone call through DOC's legal call system." *Id.* (emphasis in original).[6] Further, while defendant acknowledges that he "has a supportive [sister] that allows him the opportunity to speak with counsel" via three-way calls, *id.*; *see* Draft Hr'g Tr. at 25:3–26:7, "these calls are not set up through DOC's legal call system, and they are not constitutionally protected," Def.'s Suppl. Request at 8–9.

The government replies that it "takes these concerns seriously" and is acting rapidly in response. Gov't Suppl. Resp. at 6. DOC, for instance, now allows defense counsel, "during the crisis, [to] us[e] the jail's monitored telephone lines to communicate with detained

---

[5]     Defendant explains that DOC has a separate protocol for setting up legal phone calls for DOC residents represented by federal and D.C. public defenders. *See* Def.'s Suppl. Request at 8.

[6]     The government points out that "[i]t appears that there was a typo in at least one of defense counsel's email requests," Gov't Suppl. Resp. at 6 n.6 (citing Ex. 6, Def.'s Suppl. Request, at 24–27, ECF No. 38-1), but the government concedes that it "does not have an explanation why the other email request [from defendant's attorney] received an error message," *id.*

defendants." *Id.*  Defense counsel need merely "identify themselves immediately during the recording's introduction, and affirmatively state that the call is a privileged call," so as "to alert prosecutors or law enforcement." *Id.* at 6 n.4.  Further, in this particular case, "counsel for the government has made the additional commitment that, during the pendency of this prosecution, the government will not seek *any* jail calls made by the Defendant." *Id.* at 6 (emphasis in original).[7]  Finally, the government notes that the telephone protocol that has thus far not functioned for defendant and his counsel is "within the scope of the *Banks v. Booth* civil litigation and was discussed during an April 22, 2020 status conference in that case," at which the presiding Judge noted that "'at least some effort has been made.  It sounds like it's better than what had been in place before.'" *Id.* at 7 (alteration omitted) (quoting Ex. A, Gov't's Suppl. Resp., at 27:16–18, ECF No. 39-1 (*Banks* Apr. 22, 2020 Hr'g Tr.)).  Thus, the government has provided some assurance that the current limitations on defendant's ability to communicate with counsel are quickly being addressed. *See Jones*, No. 19-cr-232 (EGS), slip op. at 15 (denying release under § 3142(i) in part because "Judge Colleen Kollar-Kotelly recently addressed the lack of access to legal calls at [DOC facilities]," "[a]nd Judge Kollar-Kotelly ordered DOC to 'ensure that all inmates . . . have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters'" (quoting *Banks*, 2020 WL 1914896, at *15)).

In any event, defendant overstates his need to prepare his legal defense during the current pandemic.  In assessing whether temporary release pursuant to § 3142(i) is "*necessary* for preparation of the person's defense," 18 U.S.C. § 3142(i) (emphasis added), a court must account for the current stage of the defendant's legal proceedings. *See, e.g.*, *Jones*, No. 19-cr-232 (EGS),

---

[7]     The government "reserves the right to review jail calls *after* the conclusion of this prosecution to investigate other co-conspirators or subjects," but promises "[e]ven then" to "communicate with defense counsel and develop a plan to ensure it does not inadvertently review any attorney-client privileged calls." Gov't's Suppl. Resp. at 6 n.5 (emphasis in original).

slip op. at 15 (evaluating considerations such as whether upcoming hearings are scheduled); *Thomas*, 2020 WL 1911558, at *7 (similar); *Leake*, 2020 WL 1905150, at *3–4 (similar); *Armstead*, 2020 WL 1821130, at *1 (similar).  "To be sure, courts have found that the suspension of *all* legal visits may warrant the temporary release of a defendant who is otherwise unable 'to prepare his defenses' under certain circumstances, such as when the defendant is accused of an 'alleged violation of supervised release' and 'the merits hearing [is] scheduled for' the following week." *Leake*, 2020 WL 1905150, at *4 (emphasis in original) (quoting *Stephens*, 2020 WL 1295155, at *3).  Other times, however, a defendant has no imminent need to prepare his legal defense, and thus current, temporary limitations on his ability to communicate with counsel do not overcome § 3142(i)'s high bar.  *See id.* ("[I]f every pretrial detainee is entitled to temporary release under [§ 3142(i)] 'just because it would aid a defendant's ability to work with counsel,' then 'the exception in section 3142(i) would swallow all detention orders.'" (quoting *United States v. Villegas*, No. 2:19-CR-568-AB, 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020))).

Here, the circumstances do not justify temporary release under § 3142(i).  Postponement of defendant's trial due to the COVID-19 pandemic occurred on March 17, 2020.  Min. Order (Mar. 17, 2020).  Prior to that postponement, defendant's trial was scheduled for May 4, 2020. *See id.*  Thus, before defendant's trial was postponed, he and his defense counsel had fewer than seven weeks left to prepare for trial.  Now, by contrast, the parties have jointly proposed a new trial date of October 5, 2020, or later, *see* Joint Notice of Proposed Trial Dates, ECF No. 42, which is over *five months* from the present date.  Even if defendant's communications with his lawyer between now and October 5, 2020 are more limited than they were before the pandemic, defendant has not established that over a span of five months, he will be unable to accomplish what he initially planned to do in seven weeks.  *See Jones*, No. 19-cr-232 (EGS), slip op. at 15

(denying § 3142(i) motion during the current pandemic in part because the filing of the final presentence investigation report has been postponed to June 26, 2020); *Armstead*, 2020 WL 1821130, at *1 (denying § 3142(i) motion during the current pandemic in part because "even if . . . a retrial were to occur, it is not scheduled to start until May 26, 2020"); *Leake*, 2020 WL 1905150, at *4 ("There is no scheduled proceeding that requires imminent preparation by [the defendant] and his counsel here . . . .").

Further, in this instance, defendant and his defense counsel have had ample time and incentive to complete substantial preparation of defendant's case prior to implementation of COVID-19 restrictions, which is another consideration relevant to determining whether a defendant's temporary release to prepare his defense is truly necessary at the time a defendant's motion is filed. *See Leake*, 2020 WL 1905150, at *3 ("It is difficult to ascertain why [in-person] access [to the defendant's attorney] is necessary at this point in time, . . . given that [the defendant] has been detained [for over ten months], and apparently had access to both his attorney and the discovery materials in this case for months prior to [DOC's] recent access restrictions."). Over a year has passed since defendant's current attorney was appointed. *See* Min. Entry (Apr. 3, 2019). In that time, the parties have already briefed a substantial motion filed by the government under Federal Rule of Evidence 404(b), *see* Def.'s Opp'n to Gov't's 404(b) Mot., ECF No. 25, and defendant's initial deadline to file motions *in limine* has passed, *see* Min. Order (Nov. 15, 2019).[8] Accordingly, defendant and his attorney have presumably already engaged in many communications related to his legal defense.

---

[8] Defendant's deadline to file motions *in limine* has since been extended, *see* Min Order (Mar. 24, 2020), but no extension was requested until the day defendant's motions *in limine* were due, *see* Def.'s Mot. to Enlarge Deadline, ECF No. 28.

Finally, defendant's necessity argument is undermined by the fact that defendant plans not to proceed to trial with his current counsel.  As recently as the hearing on the pending motion for release, defendant relayed that he is in communications with a new attorney whom he hopes to retain for trial, and that he has not yet hired this lawyer "just because we haven't been able to see each other."  Draft Hr'g Tr. at 24:21–22.[9]  Defendant himself, thus, is likely to soon take action that will render any further communications with his current attorney superfluous.  Accordingly, at this time, defendant has not shown that his temporary release is necessary to prepare his legal defense.[10]

* * *

Defendant has not identified an appropriate third-party into whose custody he could be released, nor has he provided a compelling reason for his temporary release.  Thus, to the extent he seeks temporary release under § 3142(i), his argument fails.

## C.    Defendant's Constitutional Challenges Do Not Require His Release

Defendant's constitutional challenges to his continued incarceration are also unavailing, because he fails to establish that his release is necessary to remedy any potential violations of his constitutional rights.  The relevant legal standard is addressed first, followed by analysis of defendant's claims.

---

[9]    Defendant has not argued that his release pursuant to § 3142(i) is necessary so that he may hire this new attorney, *see* Def.'s Suppl. Request, nor has he explained why the new attorney must meet with defendant in person before being retained.

[10]    These same considerations defeat defendant's alternative argument grounded in the Sixth Amendment right to counsel.  *See* Def.'s Suppl. Request at 7–9.  "Not every restriction on counsel's time or opportunity to investigate or consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983).  Moreover, concerns such as the ones defendant identifies are likely to be addressed via less drastic remedies or via temporary release under § 3142(i) long before the Sixth Amendment would require a defendant's release.

### 1.    *Applicable Legal Standard*

Although defendant has brought his constitutional challenges to his conditions of confinement pursuant to both the Fifth and Eight Amendments, "an individual not yet convicted of a crime must challenge his treatment or the conditions of his confinement under the Due Process Clause of the Fifth or Fourteenth Amendments rather than the Eighth Amendment." *Ali v. Rumsfeld*, 649 F.3d 762, 769–70 n.10 (D.C. Cir. 2011).  "Nonetheless, it is well established that Fifth Amendment claims brought by pretrial detainees are 'generally analyz[ed] . . . under the same standards governing Eighth Amendment claims brought by prison inmates.'" *Lee*, 2020 WL 1541049, at *5 (alteration and omission in original) (quoting *Young v. Dist. of Columbia*, 107 F. Supp. 3d 69, 77 (D.D.C. 2015)); s*ee, e.g.*, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a person [in police custody] are at least as great as the Eighth Amendment protections available to a convicted prisoner."); *Russell v. Corrections Corp. of Am.*, No. 17-cv-313, 2019 WL 2503885, at *2 n.2 (D.D.C. June 17, 2019) ("[T]he Eighth Amendment standard for cruel and unusual punishment may be applied to custody of a pretrial detainee—even though such detainees have not been convicted of a crime and may not be subjected to punishment in any manner—since the conditions of confinement are comparable." (internal quotation mark omitted) (quoting *Young*, 107 F. Supp. 3d at 77)).  Thus, to prevail under the Fifth Amendment, a detainee must, as in the Eighth Amendment context, (1) allege a deprivation that is "objectively, 'sufficiently serious,'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), and (2) establish that the deprivation results from the detention official's "deliberate indifference," *id.* at 828.

Despite the similarity between the Fifth and Eighth Amendment tests, in the wake of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), courts have

recognized an important distinction between the "deliberate indifference" standards applicable to Eighth Amendment challenges versus Fifth Amendment challenges. As the Supreme Court first observed in *Farmer*, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." 511 U.S. at 836. Yet, "the term recklessness is not self-defining." *Id.* "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known," while "[t]he criminal law . . . generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." *Id.* at 836–37. The civil test is an objective standard, while the criminal test is a subjective one. *See id.* at 838–39.

Farmer held that the more exacting, subjective standard applies to Eighth Amendment challenges to conditions of confinement. *Id.* at 837. *Kingsley*, though, subsequently made clear that the subjective standard does not automatically carry over to analogous challenges alleging due process violations. 135 S. Ct. at 2470. To the contrary, *Kingsley* determined that the *objective* standard applies to a Fourteenth Amendment due process claim of excessive use of force. *Id.* In so holding, the Supreme Court reasoned that "[t]he language of [the Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process Clause] differs, and the nature of the claims often differs." *Id.* at 2475. Significantly, "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.' Thus, there is no need [in a Fourteenth Amendment excessive-force case], as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional." *Id.* (citations omitted) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–72 n.40 (1977)).

Several circuits have applied *Kingsley*'s logic beyond the excessive-force context.  The D.C. Circuit has not yet considered *Kingsley*'s ramifications, but the Second, Seventh, and Ninth Circuits have uniformly applied the objective "deliberate indifference" standard broadly to claims challenging conditions of pretrial confinement.  *See Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) ("[W]e see no doctrinal reason to distinguish among different types of conditions-of-confinement claims for purposes of applying *Kingsley*'s objective standard."); *Dent v. Sessions*, 900 F.3d 1075, 1083 (9th Cir. 2018) ("[I]n the prison context[,] . . . in evaluating due process deliberate indifference claims, we inquire whether 'a reasonable officer in the circumstances [would appreciate] the high degree of risk involved.'  That is, we [have] implemented an objective standard." (citation omitted) (third alteration in original) (quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc))); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) ("[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the [detaining ]official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [detaining ]official knew, or should have known, that the condition posed an excessive risk to health or safety.  In other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively.").  The Sixth Circuit, similarly, has "noted that *Kingsley* 'calls into serious doubt' the application of the subjective component of the deliberate-indifference test usually applied to pretrial detainees' claims."  *Martin v. Warren Cty.*, No. 19-5132, 2020 WL 360436, at *4 n.4 (6th Cir. Jan. 22, 2020) (quoting *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018)).[11]

---

[11]    The Fifth, Eighth, and Eleventh Circuits have declined to extend *Kingsley*, but these decisions—each of which devoted only a footnote to this question—provide little reason to deviate from the path set by the other

Decisions from this Court have also applied the objective version of the "deliberate indifference" standard to due process challenges to pretrial conditions of confinement. *See, e.g.*, *Banks*, 2020 WL 1914896, at *6; *United States v. Moore*, 18-cr-198 (JEB), 2019 WL 2569659, at *2 (D.D.C. June 21, 2019). *But see, e.g.*, *Lee*, 2020 WL 1541049, at *5 (applying the subjective version of the "deliberate indifference" standard). The reasoning of such cases is persuasive. "Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause . . . without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Darnell*, 849 F.3d at 35. Accordingly, to establish that conditions of confinement violate due process, a defendant need establish only that detaining officials know or should know that those conditions objectively constitute a serious risk to the defendant's health.

### 2. *Any Potential Constitutional Violation Does Not Require Defendant's Release*

As noted, a TRO was recently issued in *Banks*, a civil class action alleging that the conditions at DOC facilities during the current COVID-19 pandemic violate the Fifth and Eighth Amendments. In issuing a TRO, *Banks* determined that DOC residents are likely to succeed on the merits of their constitutional claims. *See* 2020 WL 1914896, at *6–11. Assuming, *arguendo*, that defendant can establish that his current conditions of confinement violate the Fifth Amendment Due Process Clause, as explained below, defendant's release is not required.

---

circuits discussed above. The Fifth and Eleventh Circuits declined to extend *Kingsley* because doing so conflicted with those circuits' existing precedents. *See Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017); *Nam Dang* ex rel. *Vina Dang v. Sheriff*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017). The Eighth Circuit's analysis, meanwhile, consisted of a single sentence, which focused narrowly on *Kingsley*'s holding without addressing the broad reasoning underlying that holding. *See Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) ("*Kingsley* does not control because it was an excessive force case, not a deliberate indifference case.").

As previously noted, the *Banks* TRO stops short of requiring the release of any current detainees. *See id.* at *13. Rather, *Banks* ordered that DOC take other actions to address the existing conditions, such as "ensur[ing] that the triage process associated with sick call requests on the non-quarantine units [in DOC facilities] is expedited and reflects appropriate sensitivity to the wide variety of symptoms associated with COVID-19 disease," *id.*, and "ensur[ing] appropriate and consistent implementation of social distancing policies by addressing limitations in current staffing levels[ and] supervisory oversight of line staff," *id.* at *14. *Banks*'s reasoning was sound. Unconstitutional conditions of confinement can typically be remedied without resorting to the release of a defendant.

Indeed, release of a defendant is among the most drastic remedies available for addressing unconstitutional conditions of confinement, and this remedy is not ordered lightly. The requirements of the *Banks* TRO are designed to redress the unconstitutional conditions of confinement that may currently exist at DOC facilities, and "[t]he Court has confidence that [DOC] . . . will do everything it can to comply with that order so as to prevent the further spread of the virus to its residents and staff." *Sagastume-Galicia*, 2020 WL 1935555, at *5. Thus, granting defendant his requested relief at this time would be premature.

The Court acknowledges that *Banks* declined to release detainees in part because individual motions for release, such as this one, are already pending in this and other courts. *See Banks*, 2020 WL 1914896, at *13. In so reasoning, however, *Banks* implicitly concluded, as does this Court, that the current conditions at DOC facilities do not rise to the level of a constitutional violation that requires a defendant's release absent additional considerations specific to the defendant at issue. *See id.*; *see also, e.g.*, *Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("Courts have . . . recognized this

health risk [presented by COVID-19 in detention facilities] to be particularly acute—and of constitutional significance—*for inmates who are elderly or have underlying illnesses*." (emphasis added)).  Here, as noted, defendant points to no underlying health conditions that make him especially vulnerable to contracting or suffering from COVID-19, nor to any other reason that his case for release is more compelling than that of the typical inmate.  Accordingly, defendant's constitutional challenges do not require his release.

## IV.   CONCLUSION

Based upon the written findings of fact and statement of reasons set forth above, defendant's Emergency Motion for Release from Custody Due to Immediate Threat Posed by COVID-19 Pandemic, ECF No. 30, is denied.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: April 28, 2020

_____
BERYL A. HOWELL
Chief Judge