**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA

v.

KELVIN OTUNYO,

　　　　　　　　　Defendant.

Criminal Action No. 18-251 (BAH)

Chief Judge Beryl A. Howell

---

## MEMORANDUM OPINION

Defendant Kelvin Otunyo seeks a so-called "*Kastigar* hearing," at which the government must prove, pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), that "the evidence it proposes to use" against defendant "is derived from a legitimate source wholly independent," *id.* at 460, of defendant's statements during debriefing sessions.  Def.'s Mot. for *Kastigar* Hr'g ("Def.'s Mot."), ECF No. 60.  As a remedy, defendant seeks dismissal of the Superseding Indictment, *id.* ¶ 4, charging him in five counts with Bank Fraud (Counts One and Two), in violation of 18 U.S.C. § 1344(2), Aggravated Identity Theft (Count Three), in violation of 18 U.S.C. § 1028A(a)(1), and Conspiracy to Launder Monetary Instruments (Counts Four and Five), in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(h), and 1957, *see* Superseding Indictment, ECF No. 17.

In support of the requested *Kastigar* hearing, defendant claims that after being indicted for the check fraud and identity theft schemes underlying Counts One, Two and Three, *id.*; *see also* Indictment, ECF No. 1, he agreed to a debriefing session with the government to explore the possibility of cooperating, Def.'s Mot. ¶¶ 1–2.  Asserting now that he incorrectly believed nothing he told the government at the debriefing session could be used against him in any way, defendant provided the government with his iPhone password, which defendant alleges the

government used to discover evidence that led to two additional charges, set out in Counts Four and Five, in the Superseding Indictment. *Id.* ¶ 3. He further alleges that his participation at the debriefing session "was not done in a knowing and intelligent manner and therefore, any evidence obtained from this session should not be used against him," Def.'s Mot. ¶ 11, citing his alleged misunderstanding about the scope of immunity granted in the proffer letter governing the debriefing session and his impression that he would receive a visa to remain in the United States, in exchange for his participation at the debriefing session.

Upon consideration of the extensive briefing on this issue, including supplemental briefing in response to the Court's queries, *see* Def.'s Jan. 26, 2021 Resp. to Order of the Court ("Def.'s Jan. 26 Resp."), ECF No. 68; Def.'s Feb. 2, 2021 Resp. to Order of the Court ("Def.'s Feb. 2. Resp."), ECF No. 72; Def.'s Sealed *Pro Se* Letter, ECF No. 77, and evidence elicited at the hearing held, on February 12, 2021, as to defendant's knowledge and understanding of the terms and scope of immunity provided for his debriefing sessions with the government, *see* Rough Transcript of Hearing (Feb. 12, 2021) ("Hr'g Tr. (Rough)"), for the reasons explained below, defendant's motion is denied.[1]

I.      **BACKGROUND**

The facts pertinent to defendant's pending motion are discussed in chronological order.

A.      **Defendant's Indictment and Arrest, and the Search of His Home and Vehicle**

Defendant was originally indicted on August 16, 2018 for two counts of bank fraud, in violation of 18 U.S.C. § 1344(2), and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). Indictment, ECF No. 1. According to the Indictment, defendant

---

[1]      All citations to the February 12, 2021 hearing transcript cite to a rough draft of the transcript, since the court reporter has not made a final transcript available. When the final transcript is available, it will be posted on this case's docket. Discrepancies in page numbers between the rough and final transcripts may exist.

orchestrated an elaborate check fraud scheme.  First, he used stolen personal information, including a stolen Social Security number, to provide false identification documents to an unindicted co-conspirator, and then directed that co-conspirator to use the false identity to register two different shell corporations, one in the District of Columbia and one in Maryland. *Id.* ¶¶ 6–10.  Next, defendant instructed his co-conspirator to use the false identity to open bank accounts for each of the two new shell corporations, and the co-conspirator did so.  *Id.* ¶ 12–16. Defendant then provided the co-conspirator with two stolen checks, in the amounts of $34,957.50 and $17,579.94, respectively, made out to companies with names that were very similar to the names of the two shell corporations that the co-conspirator, at defendant's direction, had registered.  *Id.* ¶ 17.  Defendant instructed his co-conspirator to deposit each stolen check into the bank account opened in the name of the similarly named shell corporation, which his co-conspirator attempted to do.  *Id.* ¶¶ 18–19.

Defendant was arrested on August 29, 2018, and arraigned the same day.  *See* Minute Entry (Aug. 29, 2018).  The government simultaneously executed search warrants of defendant's home and vehicles, where agents discovered, *inter alia*, multiple false identification documents, a bank card in a false name, documents relating to another shell corporation, and defendant's iPhone.  Gov't Opp'n Def.'s Mot. for *Kastigar* Hr'g ("Gov't Opp'n") at 2, ECF No. 65.

### B.    The October 2018 Meeting and Government's Unlocking of Defendant's iPhone

Following defendant's arrest, his counsel and the government discussed the possibility of defendant's cooperation with the government's investigation.  *Id.*[2]  In September and October

---

[2]    Defendant has been represented in this matter by four lawyers, sequentially, and Richard Stern, his attorney at the time of the October 2, 2018 meeting and the subsequent November 2, 2018 debriefing session, no longer represents him.  *See* Minute Entry (Apr. 3, 2019) (granting Stern's oral motion to withdraw from representing defendant).

2018, the parties twice attempted to meet for debriefing sessions. *Id.* at 2–3. The September meeting had to be canceled, *id.*, and so the parties subsequently met on October 2, 2018 for what was supposed to be a debriefing of defendant, *id.* at 3.

Prior to the planned October 2, 2018 meeting, the government provided defendant and his attorney with a proffer letter that set out the "ground rules" of the debriefing session. *See* Gov't's Opp'n, Ex. D, Sept. 4, 2018 Letter from Christopher R. Brown to Richard S. Stern ("Proffer Letter") at 4. Then, on the day of the meeting, Richard Stern, defendant's attorney at this time, testified at the February 12, 2021 hearing that the government attorney explained the terms of the proffer letter to defendant, Hr'g Tr. (Rough) at 37:16–17, and that Stern himself also explained the terms of the proffer letter in a private discussion with defendant, *id.* at 37:14–15; *see also id.* at 16:10–23 (testimony of defendant).[3] After that discussion, defendant decided that he did not want to proceed with the debriefing session. *See id.* at 17:2–4 (testimony of defendant).

Following the abandoned October 2018 meeting, Stern testified that he further discussed with defendant the proffer letter and defendant's decision whether to cooperate "several times," during three separate jail visits in October 2018. *Id.* at 37:14–20. More specifically, Stern testified that, regarding the scope of immunity afforded by the proffer letter, he explained to defendant that pursuant to the proffer letter, "what he said could not be used against him[,] [b]ut if [the government] found other evidence[,] that could be used against him[,] but [the government] couldn't actually use his words." *Id.* at 38:7–11. Stern further testified that during

---

[3] Defendant agreed to waive his attorney-client privilege with Stern to permit Stern to testify at the February 12, 2021 hearing about the events of the debriefing sessions and the advice Stern gave defendant concerning both the terms of the proffer letter and the possibility of receiving a visa in exchange for cooperation. *See* Def.'s Jan. 26 Resp. ¶ 4 ("Defendant is prepared to waive his attorney client privilege with respect to advice given to him by his attorney concerning the proffer agreement and the 'S' visa."); Hr'g Tr. (Rough) at 35:13–20 (defendant's confirmation, through counsel, that "he has waived his . . . attorney-client privilege, and he has no objection to Mr. Stern testifying").

these meetings, he also discussed with defendant the "benefits of cooperation" "generally speaking," *id.* at 38:20–39:17, and told defendant that securing an S visa was "something that could be done." *Id.* at 38:13.[4]  Stern denied, however, ever telling defendant that he would receive an S visa "just for sitting down and debriefing with the [g]overnment," *id.* at 38:8–13, and explained to defendant that "even if [he] had the [debriefing] meting[,] nothing could happen despite how honest [defendant] might be," *id.* at 39:2–4.

In his testimony at the February 12, 2021 hearing, defendant corroborated that his attorney met him at the D.C. jail during October 2018 to discuss the terms of the proffer letter, including the possibility of an S visa if defendant cooperated with the government's investigation.  *See id.* at 21:11–12.  He elaborated that Stern explained to him that he would "have to tell [the government] everything and show [the government] everything," and "then if [the government] believed him," he could receive an S visa "if . . . they want to go forward with it."  *Id.* at 21:21–23.  Notably, defendant did not claim that Stern told him that he would be guaranteed an S visa merely for participating in the debriefing session, and defendant testified that he understood that if he received an S visa, it would be "through a cooperation agreement," not as a condition of participating in a debriefing session.  *Id.* at 22:3–7.

Meanwhile, also in late October 2018, and unbeknownst to defendant, the government was able to recover, using iPhone "cracking" software, the password to defendant's iPhone seized during the search of his home, and to access its contents.  Gov't's Opp'n at 3; *see also* Gov't's Opp'n, Ex. C, Federal Bureau of Investigation—Device Unlock, Oct. 26, 2018 ("FBI

---

[4]        An S visa may be requested by the government on behalf of an individual who "is in possession of critical reliable information concerning a criminal organization or enterprise; . . . is willing to supply or has supplied such information to Federal or State law enforcement authorities or a Federal or State court; and . . . whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation or the successful prosecution of an individual involved in the criminal organization or enterprise."  8 U.S.C. § 1101(a)(15)(S)(i); *see also id.* § 1184(k) (limiting the number of S visas that may be issued each year).

Device Unlock") (documenting that defendant's iPhone was successfully unlocked pursuant to search warrant).

### C.    The November 2018 Debriefing Session and the Proffer Letter

Following his October 2018 discussions with his attorney, defendant decided to cooperate with the government's investigation, motivated, he says now, primarily by the possibility of receiving an S visa.  *See* Hr'g Tr. (Rough) at 18:4–5 (testimony of defendant).  Consequently, on November 2, 2018, the parties met again for a planned debriefing session, *see* Gov't's Opp'n at 3, immediately before which defendant and his attorney met again, for about twenty minutes, to discuss the proffer letter and the terms of cooperation, Hr'g Tr. (Rough) at 37:20–23 (testimony of Stern).  Defendant testified that at the beginning of the debriefing session, he, Stern, and the government attorney "talk[ed] about the debriefing letter."  Hr'g Tr. (Rough) at 18:6–12.  Stern testified that the government attorney read the proffer letter to defendant "and went over it with him."  *Id.* at 37:23–25.  A Federal Bureau of Investigation ("FBI") Special Agent present at the November 2018 debriefing session also testified at the hearing and corroborated this account, testifying that the government attorney "discussed the proffer letter in detail," "taking a substantial amount of time to go through" it.  Hr'g Tr. (Rough) at 54:11–15 (testimony of FBI Special Agent Bryce Oleski).

Defendant testified that he recalled the analogy that the government attorney used, at the outset of the November 2018 debriefing session, to explain the proffer letter's scope of immunity.  *Id.* at 20:7–10.  To illuminate the difference between direct-use and derivative-use immunity, the government attorney explained that, supposing defendant had "told [the government] [he] had killed somebody . . . and . . . buried them in [his] backyard," *id.* at 19:1–4 (question of government attorney), the government "can't use it against [him], but . . . can get a search warrant and dig up the body . . . and if [the government] find[s] a shovel in [defendant's]

garden shed, . . . [and] dust[s] it and finds fingerprints" then it "can use all of that against [defendant] in trial, the shovel, the body, and so forth," *id.* at 19:19–24 (question of government attorney). Stern corroborated that at the November 2018 meeting, the government attorney "gave [defendant] an example of had he admitted to a murder [the government] couldn't use his admission but . . . could go find other evidence if it was to be found." Hr'g Tr. (Rough) at 38:13–16.

Defendant testified that he "didn't read [the proffer letter] very well[,] as [he] was supposed to," but rather "believed . . . what [the government attorney] told [him] and what [his] lawyer explained to [him]" about the letter. *Id.* at 13:18–20. He confirmed that he recalled the government attorney's explanation of the limitation on the scope how his statements could be used to further investigate and uncover evidence against him, stating, about the buried-body analogy, "I remember the story." *Id.* at 20:9. "30 or 40 minutes into the meeting," defendant and his attorney signed the proffer letter. *Id.* at 37:25–38:1 (testimony of Stern); *see also id.* at 14:7–12 (testimony of defendant) (defendant's acknowledgement that he signed proffer letter).

In his testimony at the February 12, 2021 hearing, defendant twice acknowledged that at no point during the debriefing session did the government "promise [him] that [he was] guaranteed to receive an S visa just for sitting down and talking to" the government. *Id.* at 21:8–11 (question of government attorney); *id.* at 21:12 (testimony of defendant). He testified, out of a concern that he would be found to be "lying," that he "never said [the government] offered or spoke to [him] about an S visa during the debriefing." *Id.* at 56:13–19. Defendant's testimony that the government did not state that he would receive an S visa in return for participating in the debriefing was corroborated by both Stern, *see id.* at 39:18–22 (testimony of Stern), and the FBI Special Agent present at the debriefing, *id.* at 54:16–19 (testimony of Special Agent Oleski).

The proffer letter that defendant and his attorney signed begins by noting that the government had been advised that defendant was "interested in meeting with" the government "for a voluntary[] debriefing." Proffer Letter at 1. The letter explains that "[i]n order to assure that there are no misunderstandings concerning the parameters of the debriefing," it "clarif[ies] the terms and conditions of this and any subsequent voluntary debriefing(s) with" defendant." *Id.* It than states that "except as provided in paragraphs two and three below, no statements made by or other information provided by [defendant] during the voluntary debriefing(s) will be used directly against [him] in any criminal proceeding." *Id.*[5]

The "exception" paragraphs then proceed, in Paragraph Two, to state that, although the government would not use any of defendant's statements against him directly, "the Government may make derivative use of and may pursue any investigative leads, in this or any other investigation, suggested by any statements made by, or other information provided by, your client." *Id.* at 2. Notably, this paragraph further provides that, in agreeing to the terms of the proffer letter, defendant forgoes the right to request the *Kastigar* hearing that he now seeks:

> Because any statements made during this debriefing are voluntarily made on the part of [defendant], rather than compelled, it is the government's position that *Kastigar* protections do not apply. Nevertheless, [defendant] understands that based on the terms of this agreement there will be no *Kastigar* hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by your client.

*Id.* (footnote omitted).

---

[5] This paragraph provided defendant with "use immunity," which "means that the compelled statements cannot be used against the defendant," *United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir. 1995), even though his statements were not "compelled" but voluntary, in contrast with "derivative use immunity," which "means that the government must derive all the information used as the basis for any prosecution of the defendant from sources wholly independent of the defendant's statements," *id.* When a defendant has been granted derivative-use immunity, "[t]he government may not use the statements to uncover other incriminating evidence, focus the investigation, decide to initiate prosecution, interpret other evidence, or otherwise plan trial strategy." *Id.*

The next "exception" paragraph, in Paragraph Three, provides that the government may use defendant's statements at the debriefing session against him for the limited purpose of impeaching him "in the event [defendant] is ever a witness or presents evidence or arguments through other witnesses, at trial or any other proceeding" that contradicts his statements at the debriefing session.  *See id.*

In signing the proffer letter, defendant acknowledged that he "ha[d] read every word of this debriefing agreement, and its meaning ha[d] been fully explained to [him] by [his] attorney," and that "[a]fter consultation with [his] attorney, [he] underst[oo]d and agree[d] to the contents of this letter."  *Id.* at 4.  Stern, by signing, "acknowledge[d] that [he] ha[d] read each page of this debriefing agreement, reviewed it in its entirety with [his] client, and discussed fully with [his] client each of the provisions of the agreement."  *Id.*

After the proffer letter was signed, the government proceeded with the debriefing session, during which the government asked defendant, *inter alia*, to provide his iPhone password. Gov't's Opp'n at 4; *see* Def.'s Mot. ¶ 3.  As noted, the government had already cracked defendant's iPhone and determined his password, so asked "this question . . . to assess the defendant's honesty."  Gov't's Opp'n at 4.  Defendant provided the government with his iPhone password.  Def.'s Mot. ¶ 3.  On November 28, 2018, defendant met again with the government for a second debriefing session, at which he answered more questions, and in December 2018 he also answered, through his attorney, follow-up questions posed by the government.  Gov't's Opp'n at 4.

## D.    Defendant's Rejection of the Government's Plea Offers and the Superseding Indictment

On January 25, 2019, the government extended to defendant a "global" plea offer, which was premised on his anticipated cooperation and covered both the conduct charged in the

9

Indictment and further not-yet-charged conduct.  *Id.*  A slightly modified version of this plea

offer was extended February 11, 2019, on which day the parties had another meeting, this time to

discuss the terms of the plea offer.  *Id.*  On February 14, 2019, defendant's counsel informed the

government that defendant had decided not to accept the plea offer or cooperate further with the

government.  *Id.*  On February 21, 2019, the government extended yet another global plea offer,

without reference to defendant's cooperation, which was also rejected by defendant.  *Id.* at 5.

On March 26, 2019, the grand jury returned a Superseding Indictment against defendant,

charging him, in new Counts Four and Five, with two instances of conspiracy to launder

monetary instruments, in violation of 18 U.S.C. § 1956(h), *see* Superseding Indictment ¶¶ 29–71,

with Count Five using factual details discovered during the government's search of defendant's

home, *see id.* ¶¶ 64–71.  The Superseding Indictment, including Counts Four and Five, referred

extensively to WhatsApp chat communications that the government uncovered on defendant's

iPhone.  *See generally id.*; *see also* Gov't's Opp'n at 5.

## II.    LEGAL STANDARD

In *Kastigar v. United States*, 406 U.S. 441, "the Supreme Court held that the Fifth

Amendment bars the compelled disclosure of self-incriminating information unless the

government first grants the witness '[i]mmunity from the use of the compelled testimony, as well

as evidence derived directly and indirectly therefrom.'"  *In re Sealed Case*, 686 F.3d 799, 801

(D.C. Cir. 2012) (alteration in original) (quoting *Kastigar*, 406 U.S. at 453).  "If the government

later prosecutes that witness, it cannot use her information at all, directly or indirectly," *United*

*States v. Hemphill*, 514 F.3d 1350, 1355 (D.C. Cir. 2008), and "in any later prosecution of the

witness, the government must prove at a so-called *Kastigar* hearing that 'all of the evidence it

proposes to use was derived from legitimate independent sources' and not from the compelled

disclosure," *In re Sealed Case*, 686 F.3d at 801 (quoting *Kastigar*, 406 U.S. at 461–62).

Critically, however, *Kastigar* "simply does not apply" to a defendant who provides

information "voluntarily pursuant to [a] debriefing agreement," *id.*, like the one defendant and

his attorney signed at the outset of the November 2018 debriefing session.  In that critical

circumstance, "[t]here is nothing in . . . [*Kastigar*] that benefits [defendant] for the simple reason

that the government did not compel him to provide any incriminating information; he did so

voluntarily pursuant to the debriefing agreement."  *Id.*  Thus, when "a witness provides

information voluntarily, the government is not obligated to agree to any particular scope of

immunity," and "[t]he agreement between the government and the witness determines the scope

of immunity."  *Hemphill*, 514 F.3d at 1355; *see also In re Sealed Case*, 686 F.3d at 802 ("The

debriefing agreement alone determines the scope of [defendant's] immunity . . . .").[6]  "The terms

of [the] voluntary debriefing agreement determine what" a defendant must "prove or at

least . . . allege to earn a hearing."  *Hemphill*, 514 F.3d at 1355.  If a defendant succeeds in

---

[6]        Other Circuits are in accord that when a defendant provides information to the government pursuant to a cooperation agreement, the agreement, rather than the Fifth Amendment or the dictates of *Kastigar*, determines the scope of defendant's immunity.  *See, e.g.*, *United States v. McFarlane*, 309 F.3d 510, 514 (8th Cir. 2002) ("When a defendant enters an informal immunity agreement with the government rather than asserting his Fifth Amendment privilege against being compelled to incriminate himself, 'the scope of informal immunity is governed by the terms of the immunity agreement.'" (quoting *United States v. Luloff*, 15 F.3d 763, 766 (8th Cir. 1994))); *U.S. v. Adejumo*, 772 F.3d 513, 526 (8th Cir. 2014) ("[B]y entering into an informal immunity agreement, 'the defendant essentially gives up his right to later assert his Fifth Amendment privilege' as to the information he provided under the terms of the agreement[]." (quoting *McFarlane*, 309 F.3d at 514)); *Anthony v. Cambra*, 236 F.3d 568, 580 (9th Cir. 2000) ("When . . . the defendant has not been forced to testify and so had not claimed the Fifth Amendment privilege against self-incrimination, the government can grant the defendant varying degrees of immunity in an informal agreement." (quoting *Dudden*, 65 F.3d at 1467)); *United States v. Smith*, 452 F.3d 323, 337 (4th Cir. 2006) ("'[T]he government can grant the defendant varying degrees of immunity' when testimony is not compelled . . . ." (quoting *Dudden*, 65 F.3d at 1467)); *United States v. Aleman*, 286 F.3d 86, 89–90 (2d Cir. 2002) ("It is well settled that the government may in its discretion make agreements in which it exchanges various levels of immunity from prosecution for the defendant's cooperation[,] [and] . . . [t]he terms of the agreement govern both the conditions constituting breach or performance and the remedies available in the event of a breach.").

making such a threshold showing to thereby "earn a hearing," at any resulting *Kastigar* hearing, "the defendant has the burden to prove any government breach of the agreement."  *Id.*

## III.    DISCUSSION

Defendant argues that "pursuant to what he believed was a grant of immunity, he . . . provided [the government] the password to his iPhone, which contained a treasure trove of inculpatory information."  Def.'s Mot. ¶ 6.  Although he now acknowledges that the proffer letter that he signed granted him only direct use immunity, rather than derivative-use immunity or transactional immunity, *see id.* ¶ 7, he argues that his waiver of his Fifth Amendment right to remain silent, by participating in the debriefing session, was not voluntary and knowing because he did not fully understand "the limited scope of immunity that was being granted by the government" and "[h]e believed that any statements he made were completely protected," *id.* ¶¶ 8–9.  In his Reply to Government's Opposition to Defense Motion for *Kastigar* Hearing ("Def.'s Reply"), ECF No. 67, defendant also argues for the first time that his participation in the debriefing session was not knowing and voluntary because it was secured through the government's promise of an S visa in exchange for his participation, but the subsequent cooperation plea offer referenced but did not guarantee him an S visa.  *Id.* ¶ 2.  For its part, the government disputes defendant's contention that his participation at the debriefing session was involuntary, based as it is on the "transparently false claim that he was promised an S-visa in exchange for debriefing with the government," Gov't's Sur-Reply Opp'n to Def.'s Mot. ("Gov't's Surreply") at 2, ECF No. 75, and further argues that it did not breach the terms of the proffer letter.

The basis for the Court's February 12, 2021 hearing on defendant's motion is explained first, followed by discussion of defendant's objection that his participation at the debriefing

session was not knowing and voluntary and then of his argument that the government breached the terms of the proffer letter by using evidence he provided at the November 2018 debriefing session against him.

### A. The February 12, 2021 Hearing on Defendant's Motion

Upon defendant's suggestion in his Reply, for the first time, that the government promised him an S visa and that his attorney did not explain to him the scope of immunity afforded by the proffer letter, *see* Def.'s Reply ¶¶ 2–3, defendant was directed to submit "supplemental briefing clarifying . . . whether defendant's position is that he was promised an S visa in exchange for cooperation directly by prosecutors or by his attorney," "whether defendant intends to testify at any *Kastigar* hearing concerning his discussions with the government about an S visa and about the advice he received from his attorney about the proffer letter," and whether defendant "has any objection to the government obtaining from Mr. Stern a declaration addressing . . . how Mr. Stern advised defendant about the proffer letter . . . and . . . the nature of any representations made to defendant about an S visa if he agreed to cooperate."  Min. Order (Jan. 21, 2021).

In response, defendant submitted a cursory statement that he "believes he was promised an 'S' visa in exchange for cooperation," which understanding "he arrived at . . . after discussion(s) with both the United States and his attorney."  Def.'s Jan. 26 Resp. ¶ 1.  His response also stated that he intended to testify about the events of the debriefing session and the advice he received from his attorney about the proffer letter, but without disclosing the substance of his intended testimony.  *Id.* ¶ 2.  Further, defendant represented that, although he would waive his attorney-client privilege with Stern, he did not intend to call Stern as a witness at a *Kastigar* hearing, and objected, without identifying any basis, to the government's submission of a declaration from Stern in lieu of the government calling him as a witness.  *Id.* ¶¶ 4–5.

Defendant was subsequently directed to supplement his response with "a full and complete explication, sworn to under penalty of perjury, of precisely what he intends to testify" and "the basis for any objection to permitting the government to submit a declaration by his former counsel."  Min. Order (Jan. 26, 2021).  Defendant's counsel arranged to meet defendant at the District of Columbia Central Detention Facility, where defendant is detained pending trial, to discuss how to respond to this order, but at the meeting, defendant declined to provide a statement to his attorney, evidently because the statement was written and he "did not feel comfortable relying on" the jail personnel "to relay anything to counsel."  Def.'s Feb. 2 Resp. ¶ 3.  Instead, defendant represented that he "intend[ed] to send the Court a letter, in the mail, answering the Court's question[s]."  *Id.*[7]

Defendant's bald assertions, in his Reply and two subsequent supplemental responses to the Court's queries, that he did not understand the scope of immunity afforded by the proffer letter and that he was promised an S visa in exchange for his participation at the debriefing session, failed to make the requisite threshold showing necessary to "earn a hearing," *Hemphill*, 514 F.3d at 1355, on the issue of whether his participation at the debriefing session was voluntary or whether the government breached the terms of the proffer letter.  His ambiguous, shifting, and unsupported implications that the government coerced his participation at the debriefing session with a false promise of an S visa, and that his attorney did not explain to him that he was receiving only direct-use, not derivative-use or transactional, immunity, did not warrant a hearing on these matters.

---

[7]     On February 11, 2021, the day before the hearing scheduled on defendant's pending motion, the referenced letter was received and docketed under seal the following day.  *See* Def.'s Sealed *Pro Se* Letter, ECF No. 77. The pertinent aspects of this letter were subsequently covered by defendant and the other witnesses at the February 12, 2021 hearing, rendering unnecessary further recitation of its contents here.

Tellingly, defendant never alleged that the government in fact promised him an S visa in return for his participation at the debriefing session, instead stating only that "he understood" that he would receive such a visa.  Def.'s Reply ¶ 2.  Indeed, as noted, at the February 12, 2021 hearing, he testified that, lest he be found to be "lying," he had "never said [the government] offered or spoke to [him] about an S visa during the debriefing."  Hr'g Tr. (Rough) at 56:13–19.  The Court afforded defendant two opportunities to clarify his claims about the representations made to him by the government about the S visa and the advice he received from his lawyer, *see* Min. Orders (Jan. 21, 2021 and Jan. 26, 2021), yet defendant repeatedly declined to avail himself of these opportunities until sending his own letter just before the hearing. This only frustrated the Court's efforts to determine precisely what the defendant may have misunderstood and alleged happened at the November 2018 debriefing session.

To dispel any doubt about the voluntariness of defendant's participation at the debriefing session, a hearing on this issue proceeded on February 12, 2021.  *See* Min. Order (Feb. 4, 2021) (clarifying that "[t]he February 12 hearing will not be a '*Kastigar* hearing' directed at determining whether the government breached the terms of the proffer agreement governing defendant's November 2018 debriefing session" but rather "to determine whether defendant has made the requisite threshold showing" under *Hemphill*, 514 F.3d at 1355, to earn a hearing on the issue of whether the government breached the terms of the proffer letter).  At that point "defendant ha[d] failed to make such a showing by refusing to submit any sworn statement concerning (1) his understanding the scope of immunity afforded by the proffer letter upon consultation with then-counsel; or (2) representations to him regarding an S visa."  *Id.*  As such, "defendant w[ould] be expected to testify at the February 12 hearing concerning those matters to

make a threshold showing that his participation at the debriefing session was not knowing and voluntary." *Id.*

Defendant's two arguments in support of his contention that his agreement to debrief was premised on a promise of an S visa and a misunderstanding of the scope of immunity granted, and therefore unknowing and involuntary, are now addressed.

### B.   Defendant's Participation at the November 2018 Debriefing Session

As explained below, *see infra* Part III.C, the proffer letter dictating the terms governing the November 2018 debriefing session forecloses defendant's request for a *Kastigar* hearing. Perhaps realizing that fact, defendant has alleged, that, for two reasons, his assent to the terms of the proffer letter, and therefore his participation in the debriefing session, was not knowing and voluntary.  First, he argues that he did not adequately understand the terms of the proffer letter, in particular the scope of immunity he would receive, because the letter was not adequately explained to him.  Second, he contends that his participation was involuntary because it was based on an incorrect impression that he would receive an S visa in return.  These arguments are discussed in turn, and both fail.

#### 1.   *The Scope of Immunity Afforded by the Proffer Letter*

First, defendant contends that his participation at the debriefing, and concomitant waiver of his Fifth Amendment right to remain silent, were not voluntary because he misunderstood the scope of immunity he would receive pursuant to the proffer letter, *see* Def.'s Mot. ¶ 9; *see also* Def.'s Reply ¶ 3.  He argues that he erroneously "believed that any statements he made were completely protected," Def.'s Mot. ¶ 9, and thus that "no use, for any reason, of his debriefing statements could be made by the authorities," Def.'s Reply ¶ 3.  As a result, according to defendant, "his waiver of his Fifth Amendment right to remain silent was not voluntary and . . .

was . . . not knowingly and intelligently made," *id.* ¶ 1, and his participation at the debriefing session was therefore "not valid," *id.* ¶ 2.

This contention is belied by the hearing record.  Though defendant is correct that he "was dependent on others," namely his counsel and the government attorney, "to outline the parameters of the debriefing session," Def.'s Mot. ¶ 10, his "alleg[ation] that this was not done," *id.*, is contradicted by his own acknowledgement, under oath, that he remembered both his counsel's multiple visits to him to discuss the terms of the proffer letter, *see* Hr'g Tr. (Rough) at 21:11–12 (testimony of defendant), and the explanation of the scope of immunity afforded by the proffer letter that the government attorney provided, *see id.* at 20:7–10 (testimony of defendant). Direct-use immunity, as explained by the government attorney's buried-body analogy, would prevent the government, from using defendant's statement "There is a body buried in my backyard" against him, but *not* from relying on that statement to obtain a search warrant and investigate the backyard for itself, and thereafter use any evidence discovered in that search against defendant.  *See id.* at 19:1–20:10 (testimony of defendant responding affirmatively that he recalled that discussion).

Defendant's argument is also at odds with Stern's testimony that he explained the terms of the proffer letter to defendant "several times," *id.* at 37:14–21, including explaining that the direct-use immunity provided by the proffer letter prevented the government only from using defendant's words directly against him, but not from relying on his words to discover other evidence that it could use against him, *see id.* at 38:18–38:11.  Finally, defendant's testimony that he read the proffer letter only briefly before signing it, *see id.* at 14:8–12, and his assertion about not understanding the scope of the immunity he was receiving is also contradicted by his signed statement that he had "read every word of this debriefing agreement," "its meaning ha[d]

been fully explained to [him] by [his] attorney, and "he "underst[oo]d and agree[d] to the contents of" the proffer letter "[a]fter consultation with [his] attorney," as well as with Stern's signed statement that he "read each page of this debriefing agreement, reviewed it in its entirety with [his] client, and discussed fully with [his] client each of [its] provisions."  Proffer Letter at 4.

Likewise unpersuasive is defendant's claim that "any ambiguity in the language of the agreement [must] be resolved against the government," Def.'s Mot. ¶ 9, for the simple reason that the language of the agreement is not ambiguous, particularly in light of the explanation of that language that defendant received from the government attorney and his own then-counsel. Defendant relies heavily on *United States v. Oruche*, 257 F. Supp. 2d 230 (D.D.C. 2003), in which, he claims, a "practically identical" proffer letter was found by another Judge of this District to be ambiguous.  Def.'s Mot. ¶ 10.  Defendant correctly notes that the proffer letter at issue in *Oruche* was substantially identical to the proffer letter here, and that the *Oruche* Court ordered a *Kastigar* hearing, based in part on its determination that the language of the letter "was not sufficiently clear and unambiguous that a layperson, such as the defendant, would be able to comprehend the limitation it was placing on the grant of immunity that was conferred," *Oruche*, 257 F. Supp. 2d at 240.  Crucially, however, the *Oruche* Court had considered and credited evidence that defendant's attorney incorrectly "advised [defendant] that what he said during the debriefing could not be used against him in any manner," *id.*, and so while acknowledging that the proffer letter's language might be ambiguous to a "layperson," the court noted that "[h]ad the defendant received accurate legal advice from his attorney prior to the debriefing regarding the scope of the immunity being granted by the Debriefing Letter, any potential misconceptions about the scope of immunity due to the agreement's lack of clarity would presumably have been

ameliorated," *id.*; *see also id.* at 241 ("[W]hile competent counsel would be able to explain to a client the meaning of derivative use, without such advice, a layperson cannot be expected to comprehend the term.").  Further, the court explicitly stated that it was "not deciding that the immunity agreement in this case is *per se* ambiguous [or] that the agreement, in and of itself, necessitates a *Kastigar* hearing," instead explaining that defendant misunderstood the agreement "because . . . its lack of clarity was exacerbated by incorrect advice having been provided by the defendant's attorney regarding the scope of the immunity being granted."  *Id.* at 240 n.8.

Here, unlike in *Oruche*, no evidence even suggests that defendant's attorney advised him incorrectly about the terms of the proffer letter.  To the contrary, as explained, defendant's counsel explained to him multiple times that the direct-use immunity offered by the proffer letter meant only that the government could not use his "words" against him.  Hr'g Tr. (Rough) at 38:1–3 (testimony of Stern).  Further, any misunderstanding defendant may have had about the scope of immunity would have been dispelled by the government attorney's intuitive, intelligible dead-body-in-the-backyard analogy, which explanation defendant recalled receiving, *see id.* at 20:7–10 (testimony of defendant).  Accordingly, *Oruche*'s observations about the potential ambiguity of the proffer letter's language to a layperson are inapplicable to defendant's situation, because he was amply advised about the meaning of the letter.

Finally, defendant describes himself as too naïve about American law to understand the scope of immunity afforded by the proffer letter.  To bolster his claim of misunderstanding, defendant suggests that his "level of sophistication is greatly exaggerated by the prosecution," Def.'s Reply ¶ 3, and that his role in the fraud scheme with which he is charged is characterized not by "sophistication" but rather by "following a play book, complete exposure, and ultimately arrest," *id.*  Not so.  This defendant was allegedly engaged in a series of, if not simultaneous,

four complex fraud schemes involving eight co-conspirators.  *See United States v. Otunyo*, Criminal Action No. 18-251 (BAH), 2020 WL 2065041, at \*1–2 (D.D.C. Apr. 28, 2020) (noting that the Superseding Indictment charged defendant with "engag[ing] in four separate schemes to launder the proceeds of seven stolen and unauthorized checks, totaling over \$303,200.00, from multiple victims," with "Co-Conspirators A, B, C, D, E, F, G, and H"); *see also* Superseding Indictment ¶¶ 29–71, demonstrating his understanding and, indeed, mastery of complex thinking, planning, and coordination.

Moreover, as already noted, the analogy used by the government attorney to explain direct-use immunity was simple, intuitive, and accessible to a layperson.  Defendant understates his own level of sophistication and ability to understand the scope of immunity.  He has graduated from high school, speaks English "perfectly well," and has lived in the United States since 2007, when he was 23 years old.  *See* Hr'g Tr. (Rough) at 22:10–21 (testimony of defendant).  Further demonstrating defendant's facility with understanding legal matters, in April 2020, defendant submitted a six-page *pro se* motion for pretrial release due to the ongoing COVID-19 pandemic, *see* Def.'s Emergency Mot. Pretrial Release, ECF No. 45, for which defendant did a "fair amount" of legal research on his own, without assistance, Hr'g Tr. (Rough) at 29:5–24 (testimony of defendant).  Defendant testified articulately at the February 12, 2021 hearing, clearly represented a deep understanding of the chronology and facts of his case, and has submitted *pro se* filings that are well written, thoughtfully structured, and supported with pertinent legal research.  Defendant was thus eminently capable of understanding the scope of immunity of the proffer letter, particularly given the multiple explanations of that immunity given him by his own attorney and the government attorney.

2.      *The S Visa*

Next, defendant suggests that his participation at the debriefing session was involuntary because it was secured under false pretenses, as "he understood that he would be able to obtain an 'S' visa if he chose to cooperate," and "would not have agreed to debrief and cooperate if that were not the case."  Def.'s Reply ¶ 2.  So, "[w]hen a cooperation plea agreement was tendered" after the debriefing session" that contained only "a reference to possible immigration assistance, but no promise of an 'S' visa," defendant "felt betrayed and refused to continue to cooperate." *Id.*  As a result, defendant argues, his "decision to debrief was involuntary and, therefore, not valid."  *Id.*  The government acknowledges that at the November 2018 debriefing session, "there were discussions of an S-visa as a *possible* outcome of a cooperation plea agreement (not debriefing)," observing that "[i]t is not unusual or improper for the government to discuss the potential benefits of cooperation with a defendant," Gov't's Surreply at 3 (emphasis in original). The government denies, however, that defendant was ever promised an S visa in return for his participation at the debriefing.  *Id.* at 2–3.

In light of the testimony heard at the February 12, 2021 hearing, defendant has failed to make the requisite threshold showing that his participation at the debriefing was involuntary because it was secured by a false guarantee of an S visa.  Notably, although defendant's Reply states that "*he understood* that he would be able to obtain an 'S' visa if he chose to cooperate," Def.'s Reply ¶ 2 (emphasis added), it does not go so far as to allege that the government promised that he would be able to obtain an S visa in return for his participation at the debriefing session.  Indeed, this point was one on which clarification was specifically requested, *see* Min. Orders (Jan. 21, 2021 and Jan. 26, 2021), which clarification defendant twice declined to provide.

The hearing testimony clarifies defendant was not promised an S visa in exchange for his participation at the debriefing session, and that, consequently, any such expectation on defendant's part was unreasonable.  Specifically, defendant twice acknowledged that no government representative ever promised him an S visa merely for participating in the debriefing session.  *See* Hr'g Tr. (Rough) at 21:8–11; *id.* at 56:14–19.  Instead, he testified that his own attorney told him that he would receive an S visa in exchange for participating at the debriefing session.  *See id.* at 21:11–12 (testimony of defendant).  This claim was emphatically denied by defendant's then-defense counsel.  *Id.* at 38:17–22, 39:24–40:2 (testimony of Stern).  Defendant's assertion on this point was later walked back, when he acknowledged that Stern's representation to him was not that he would receive an S visa solely in exchange for his participation at the debriefing, but rather that it might be available if he told the government "everything" and the government "believe[d] [his] story."  *Id.* at 21:20–24.  Thus, defendant's testimony reflects that he understood that he would not automatically receive an S visa merely for participating at the debriefing session, and rather that the S visa would be contingent on, among other things, his complete and ongoing cooperation and the government's determination that he had told the truth.  Furthermore, defendant's argument is directly contradicted by the proffer letter itself, which expressly states that defendant "client understands that [the government] has made no additional promises to [defendant] not contained in writing herein." Proffer Letter at 2.  Defendant's signature on the proffer letter indicates that he read this provision and understood it, with the assistance of his attorney.

In sum, then, the hearing testimony refutes both defendant's suggestion that he was promised an S visa in exchange for participating at the debriefing session and his claim that he thought he would receive an S visa in exchange for his participation.  Consequently, his

argument that a broken promise of an S visa rendered his participation at the debriefing "involuntary and . . . not valid," Def.'s Reply ¶ 2, is simply unsupported.

### C.     Defendant Has Not Made the Threshold Showing that the Government Breached the Terms of the Proffer Letter Necessary to Earn a Hearing

Having established that defendant has not made the requisite threshold showing to warrant a hearing on whether his participation at the November 2018 debriefing session was involuntary, defendant's challenge to the government's use of his iPhone password, which he provided at the debriefing session, is now considered.  Defendant argues that the government should not be permitted to use the evidence it obtained from his iPhone, after he provided the government with his password at the November 2018 debriefing session, against him, Def.'s Mot. ¶¶ 3, 6, 11, and requests a *Kastigar* hearing at which the government must "prove that the evidence it presented to the grand jury and that it intends to introduce at trial is not tainted by any of" his statements at the debriefing session, *id.* at 4–5.  For three independent reasons, this argument fails.

First, as explained, *Kastigar* does not apply to defendant because he provided information voluntarily pursuant to a proffer agreement, and so "'*Kastigar*' is a misnomer for the hearing [he has] demanded," *Hemphill*, 514 F.3d at 1355.  According to the express terms of the proffer letter that defendant and his counsel both agreed to, "there will be no *Kastigar* hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by" defendant.  Proffer Letter at 2.  As explained, when a defendant provides information to the government pursuant to a proffer agreement, the agreement dictates the terms that govern defendant's cooperation, including the scope of the immunity that defendant enjoys from the subsequent use of the information he provides.  *See Hemphill*, 514 F.3d at 1355.  Here, the agreement clearly provides that defendant

forgoes his right to request a *Kastigar* hearing, and defendant's argument that he did not knowingly do so because his agreement to the terms of the proffer letter was unknowing has already been rejected.  Thus, having previously agreed that there would be no *Kastigar* hearing, defendant is foreclosed from now requesting such a hearing.

Second, even if the proffer letter did not foreclose defendant's request for a *Kastigar* hearing, the government's alleged use of his iPhone password to access his WhatsApp chats and bolster the charges in the Superseding Indictment would not have violated the terms of the proffer letter.  As explained, the proffer letter provided only that "no statements made by or other information provided by [defendant] during the voluntary debriefing(s) will be used *directly against* [defendant] in any criminal proceeding."  Proffer Letter at 1 (emphasis added).  The proffer letter specifically stated, however, that "the Government may make *derivative* use of and may pursue any investigative leads, in this or any other investigation, suggested by any statements made by, or other information provided by," defendant.  *Id.* at 2 (emphasis added).

The government complied with those terms.  The Superseding Indictment does not "attribute any statement" defendant made during the debriefing session to defendant, and does not "direct[ly] use" information defendant provided "within the meaning of [the proffer] agreement."  *Hemphill*, 514 F.3d at 1356.  In other words, even if defendant's allegation were true that the government was able to access his WhatsApp chats only because he provided his iPhone password at the November 2, 2018 debriefing session, his statement providing the iPhone password was not directly used against him in the Superseding Indictment.  Instead, even under defendant's version of events, the government used information he provided to discover a further lead and new evidence, namely his WhatsApp chats.  As defendant acknowledges, *see* Def.'s Reply ¶ 1 ("Mr. Otunyo does not allege that the United States 'directly' used statements made by

him (during debriefing sessions) to obtain a superseding indictment."), that would qualify as derivative use expressly allowed by the proffer letter, *see Hemphill*, 514 F.3d at 1355–56; *cf. United States v. Hubbell*, 530 U.S. 27, 43 (2000) (noting that government's use of contents of documents produced by defendant pursuant to direct-use immunity constituted derivative use of those documents).

Third, even if the proffer letter did not foreclose defendant's request for a *Kastigar* hearing, *and* putting aside the point that, at most, defendant's motion alleges that the government derivatively used information he provided at the debriefing session against him, which was permitted by the proffer letter, a *Kastigar* hearing would be unnecessary and dismissal of the Superseding Indictment would be unwarranted because the government did not use, directly or derivatively, *any* information provided by defendant at the debriefing session against him.  The government proffers that the Superseding Indictment was "[w]holly [i]ndependent" of the information defendant provided at the November 2, 2018 debriefing, Gov't's Opp'n at 11, because, as explained, it had already independently discovered defendant's iPhone password, and obtained access to the contents of his phone, by the time defendant provided the government with that information.  *See* FBI Device Unlock.  Thus, even were a *Kastigar* hearing necessary or appropriate, which it is not, the government would be able to carry its "heavy burden," *Kastigar*, 406 U.S. at 461, "to prove that the evidence it proposes to use [was] derived from a legitimate source wholly independent of," *id.* at 460, the information defendant provided at the debriefing session.

Defendant "disputes the [government's] allegation that the FBI obtained his passcode for his phone in advance of him telling them about it," arguing that GrayKey, the phone unlocking tool the government used to discover his iPhone password "is not . . . foolproof."  Def.'s Reply

¶ 4.  In support, he cites *United States v. Morgan*, 443 F. Supp. 3d 405 (W.D.N.Y. 2020), in which the government, using GrayKey, "was still trying to sequence a 6-digit password from an iPhone after a year [and] a half of painstaking effort," Def.'s Reply ¶ 4.  "GrayKey uses 'brute force' to try and access the iPhone, a process by which a computer program enters potential passcodes *seriatim* until the correct passcode is revealed," *Morgan*, 443 F. Supp. 3d at 407 (emphasis in original), and given that "[a] six-digit passcode yields 1,00,000 potential passcode combinations," *id.*, it stands to reason that the time it would take for GrayKey to successfully "crack" a phone would vary from phone to phone, the more so given that defendant's iPhone password contained only four digits, not six, *see* Gov't's Opp'n at 3.  Thus, the fact that the government spent months trying unsuccessfully to unlock the iPhone at issue in *Morgan* casts no doubt on the government's representation that it successfully used that tool to discover defendant's password in this case.  In other words, even if GrayKey is not "foolproof," as defendant claims, Def.'s Reply ¶ 4, that does not mean that it did not work successfully here.[8]

## IV.    CONCLUSION

For the foregoing reasons, defendant has failed to make a threshold showing either that he misunderstood the scope of immunity afforded by the proffer letter or that the government secured his participation at the November 2018 debriefing session through a false promise of an S visa, and, as such, his contention that his participation at the debriefing was involuntary and therefore invalid is rejected.  Further, defendant is not entitled to the requested *Kastigar* hearing because (1) pursuant to the terms of the proffer letter, defendant has already agreed to forgo a *Kastigar* hearing; (2) his motion alleges, at most, derivative use of information he provided the

---

[8]      Nor is defendant's "distrust[]" of the FBI,  which distrust is "heavily influenced by the negative new[s] articles he has been exposed to over the past several years," Def.'s Reply ¶ 4, sufficient to rebut the government's evidence that it discovered his iPhone password before the November 2, 2018 debriefing session.

government, which the proffer letter permits; and (3) in any event, the government did not use, directly or derivatively, information that defendant provided at the debriefing session.  A hearing on whether the government breached the terms of the proffer letter by using defendant's iPhone password against him is therefore unwarranted and unnecessary, and defendant's motion for a *Kastigar* hearing is denied.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: February 18, 2021

_____
BERYL A. HOWELL
Chief Judge