### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Criminal No. 18-cr-251 (BAH)** |
| | : | |
| KELVIN OTUNYO, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The government recommends that the defendant, Kelvin Otunyo ("Otunyo" or the "defendant"), be sentenced to a term of imprisonment of at least the mid-level of the recommended sentencing range under the U.S. Sentencing Guidelines for Counts One, Two, Four, and Five, calculated by the government to be at least 72 months; and the statutory term of 24 months for Count Three. The government respectfully submits that such a sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).   In support of this motion, and to assist the Court in fashioning an appropriate sentence, the Government submits the following:

### FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case should be familiar to the Court from the defendant's sworn responses during the plea colloquy at the April 1, 2021 plea hearing; additional evidence proffered by the government at the April 1, 2021 plea hearing; the defendant's sworn testimony at the February 12, 2021 hearing on his motion for a *Kastigar* hearing; the various exhibits submitted during the course of the proceedings in this case; and the Indictment and Superseding Indictment.

In short, the defendant is a prolific fraudster who organized and recruited others into multiple financial fraud and money laundering schemes.   Each scheme involved some variation

on the same pattern:   the defendant and co-conspirators would obtain stolen or unauthorized checks from victims, establish fraudulent shell corporations, open fraudulent bank accounts using false identification, deposit the stolen or unauthorized checks, and then launder or attempt to launder the resulting proceeds.   Most of the defendant's schemes were committed while he was still on probation for a prior conviction in New York State.   The defendant committed his frauds using false IDs and stolen identities, including the name and Social Security Number of IDENTITY THEFT VICTIM A.   The defendant communicated with his co-conspirators and criminal associates using WhatsApp, an encrypted messaging app.   The defendant recruited others to work for him in his schemes, including co-conspirator Samson Olawale Afolabi, *see* D.D.C. No. 21-cr-251, and PERSON A, who, unbeknownst to the defendant, was acting under the direction of federal law enforcement at the time.   The defendant was a protégé of Michael Orji ("Orji"), who was arrested on November 20, 2017 and sentenced by this Court on June 24, 2018; following Orji's arrest, the defendant supplanted Orji's position as the manager and orchestrator of a series of increasingly brazen schemes.

In approximate chronological order, the defendant's schemes are described below.

**A.  Scheme 1:   Due South Concrete LLC (Count Four)**

In August and September 2017, the defendant registered a Maryland corporation and opened a SunTrust bank account in the name of "Due South Concrete LLC," using his false alias B.A.   Shortly thereafter, on or about September 7, 2017, the defendant facilitated the deposit of two stolen checks (for $24,153.42 and $26,200.00) into the account.   Both checks were payable to "Due South Concrete LLC."   Approximately one month later, on or about October 19, 2017, the defendant deposited a third stolen check (for $22,400.96) into the same account.   The

defendant laundered these proceeds through checks to co-conspirators and large cash withdrawals at Maryland Live Casino.

The defendant organized this scheme with a co-conspirator called "Endy" (identified as "Endy New" in the defendant's phone, and referred to in the Superseding Indictment as CO-CONSPIRATOR D).   On October 20, 2017, Endy sent a WhatsApp chat message to the defendant with the name of CO-CONSPIRATOR B and Wells Fargo bank account information—in other words, telling the defendant how to launder the fraud proceeds.   On or about the same day, the defendant wrote out a check for $11,500.00 payable to CO-CONSPIRATOR B, drawn on the "Due South Concrete LLC" account, and deposited it into the bank account specified in the message from Endy.   The next day, on October 21, 2017, the defendant texted Endy a photograph of a Wells Fargo deposit slip confirming a deposit of $11,500.00 into the same account number. Later in the same day, Endy responded to the defendant with a screen-shot of a Wells Fargo online banking app showing the a deposit of $11,500.00 at a location in Washington, D.C., likely to confirm receipt of the laundered funds.

### B.  Scheme 2:   Novotel Medical Supply, LLC (Count Five)

Beginning November 2, 2017, the defendant communicated via WhatsApp with a co-conspirator called Adeniyi (identified in the defendant's phone as "Adeniyi Jersey," and referred to in the Superseding Indictment as CO-CONSPIRATOR E) about a stolen check from a California municipality, which was payable to a California public utility company.   Adeniyi texted to the defendant, "Please tell me asap if you can't handle it so I give it back to them b4 is too late. Thanks."   The defendant responded that the "name" on the check—in other words, the California public utility company—would be "difficult to open," and suggested that someone "clean" it.

On November 6, 2017, the defendant sent a WhatsApp message to his co-conspirator, Afolabi (who was identified as "Wale" in the defendant's phone), with the name, birthdate, and address for Afolabi's alias A.S.   Afolabi responded, "Ok boss."   On November 9, 2017, the defendant asked Afolabi for his height and weight, and asked, "How far the pic."   Afolabi responded with a selfie photograph, apparently for use in fabricating a false ID.

Further on November 9, 2017, the defendant sent a WhatsApp message to update Adeniyi of his progress, informing him, "I Dey On My way to register and open, Novotel medical supply Llc."   On the same date, the defendant used WhatsApp to send Afolabi information including the name of a new the company, "Novotel Medical Supply," and the following description of the company's purpose:   "You basically supply medical equipments to group homes and other facilities."   The defendant instructed Afolabi to obtain a Tax Identification Number for "Novotel Medical Supply."   When Afolabi replied, "I go do am once I reach house," the defendant admonished him, "No Dey use your personal computer do am / Use public like library or fedex."

On November 16, 2017, as directed by the defendant, Afolabi established a First National Bank of Pennsylvania account with account number ending in 6047 ("FNB Account 6047") in the name of "Novotel Medical Supply, LLC."   In opening the account, Afolabi used the alias A.S., birth date in 1983, and address in Capitol Heights, Maryland previously provided to him by the defendant.   Afolabi also established a personal bank account at First National Bank of Pennsylvania with account number ending in 7931 ("FNB Account 7931") in the name of his false alias, A.S.

Further on November 16, 2017, the defendant used WhatsApp to direct Afolabi to "send me pic of the check and ein."   Afolabi replied with photographs of blank checks for FNB Account

6047 and FNB Account 7931, and a photograph of an IRS letter assigning an Employer Identification Number (EIN) to "Novotel Medical Supply LLC."

On the same day, the defendant forwarded this bank account information via WhatsApp to his co-conspirator Adeniyi.   Perhaps taking the credit for opening the account himself, the defendant texted Adeniyi, "I'll send you the acct no in a few inside the bank now."   He then texted Adeniyi photographs of a blank check for FNB Account 7931 and of the IRS letter assigning an EIN to "Novotel Medical Supply, LLC," which Afolabi had previously supplied to him. Adeniyi replied, "Got u, I 4wrd it, hopefully I'll mail out on Saturday or Monday."

On or about November 20, 2017, a stolen check in the amount of $41,322.75, payable to "Novotel Medical Supply LLC," was deposited into FNB Account 6047.   The check was identical to the check from the California municipality, depicted in the photograph previously provided to the defendant by Adeniyi, except the check was altered—or "cleaned"—so that it appeared to be payable to "Novotel Medical Supply LLC" rather than to the California public utility company.   Further on or about November 20, 2017, the defendant used WhatsApp to send Adeniyi a photograph of a First National Bank of Pennsylvania deposit slip showing the check deposit, confirming that he had deposited the stolen and altered check.

Following the check deposit from the California municipality, the fraud proceeds were laundered through layering transactions to and from Afolabi's second account at First National Bank of Pennsylvania, and through a $30,500 check written out to "United Petroleum Transport LLC."   The defendant had previously established a First National Bank of Pennsylvania bank account in the name of United Petroleum Transport LLC, a shell company created for the fraud, on September 27, 2017, using his false alias B.A.   After depositing the $30,500 check, the

defendant attempted to liquidate that account by conducting a number of debit transactions and cash withdrawals, including an ATM withdrawal in the amount of $480.00 on or about November 27, 2017, in the District of Columbia.

On or about November 22, 2017, the defendant received a WhatsApp message from the co-conspirator "Fola" (identified in the defendant's phone as "Fola Faps," and referred to in the Superseding Indictment as CO-CONSPIRATOR G) showing a photograph of images of two stolen checks.   One of the checks was from an apartment development in Midlothian, Virginia in the amount of $35,870.00.

On or about November 28, 2017, an unauthorized check in the amount of $35,870.00, payable to "Novotel Medical Supply," was deposited into FNB Account 6047.   The check was drawn on the account of the above-referenced apartment development in Midlothian, Virginia.   It appeared to be a close copy of the check shown in the photograph previously provided by Fola— containing the same check number, date, routing and account numbers for the victim check-maker, and same exact amount.

The proceeds of this check were laundered by check to co-conspirators, including CO-CONSPIRATOR H and a check to the shell company "Salvage Auto Exporters LLC."   On or about November 29, 2017, the defendant used WhatsApp to send Afolabi instructions for laundering the proceeds of the check, including the name of "Salvage Auto Exporters LLC," and a SunTrust bank account number ending in 6540.   Afolabi asked, "How much?" to which the defendant responded, "16,500."   The defendant further texted, "Auction car payment," and then, "For memo."

On or about November 30, 2017, as directed by the defendant, Afolabi issued a check from FNB Account 6047 payable to "Salvage Auto Exporters LLC" in the amount of $16,500.00.   The memo field of the check contained the notation "Auction car payment."   On the reverse side, the check contained the further notation, "For deposit only" and listed the same account number ending in 6540 previously provided to Afolabi by the defendant.

### C.  Schemes 3 & 4: Toyo Ink America LLC & Dometic Corporation (Count Five)

On or about June 15, 2018, the co-conspirator Adeniyi used WhatsApp to send the defendant the following message:   "77 & 75."   The defendant responded, "Cool / Can get it on Monday."   On or about June 16, 2018, Adeniyi used WhatsApp to send the defendant images of two stolen checks:   (1) a check in the amount of $77,761.39, payable to "Toyo Ink America LLC"; and (2) a check in the amount of $75,499.33, payable to "Dometic Corporation."   The defendant then engaged in complex, simultaneous schemes to deposit and launder both checks at two different banks.

On or about June 18, 2018, the defendant established a Maryland corporation in the name of "Toyo Ink America LLC," using his false alias M.S.

On June 19, 2018, Adeniyi requested a status update from the defendant via WhatsApp, asking, "How far bro, my guys are waiting for u, any progress?"   The defendant responded, "Yeawedo.   Finish the business registrations just waiting on the oju."   Adeniyi told the defendant, "Ok, best of luck, you said you can handle the two.   My guys are bn sceptical, but I gave them my word that trustworthy, especially the second guy that owns that 77, well is well."

Further on or about June 19, 2018, the defendant used WhatsApp to send Afolabi instructions for registering Dometic Corporation:   "Dometic corporation inc / Purpose buying and

fixing houses, domestic real estate, renovations and supply of building materials at low prices. / no put that inc at first." Afolabi responded, "Ok." On or about the same date, June 19, 2018, as directed by the defendant, Afolabi established a Maryland corporation in the name of "Dometic Corporation," using the false alias A.S. The corporate registration paperwork indicated that the purpose of "Dometic Corporation" was: "Buying and fixing houses, domestic real estate, renovations and supply of building material at low prices."

Further on or about June 19, 2018, the defendant used WhatsApp to send Adeniyi a message stating that he had "Finish[ed] the business registrations."

### a. Deposit of Stolen Check and Laundering Involving Toyo Ink America LLC

On or about June 25, 2018, the defendant established a PNC Bank account with account number ending in 4205 ("PNC Account 4205") in the name of "Toyo Ink America" using the false alias M.S. On or about June 26, 2018, a stolen check in the amount of $77,761.38, payable to "Toyo Ink America LLC," was deposited into PNC Account 4205. The check was identical to the image previously provided by Adeniyi.

The defendant attempted to launder out the proceeds of the stolen check, but PNC Bank froze the funds very quickly. On or about July 2, 2018, the defendant made ATM cash withdrawals totaling $123.00 from PNC Account 4205. On or about July 3, 2018, the defendant obtained an ATM receipt showing that the Toyo Ink America account had been deactivated. On or about July 4, 2018, the defendant sent a message to Adeniyi via WhatsApp to explain about the account deactivation, stating that "they called the Number on the account, requesting for copy of the Id and asking questions, about the funds." The defendant followed up with a photograph of the above-referenced ATM receipt.

### b. Deposit of Stolen Check and Laundering Involving Dometic Corporation

Acting pursuant to the defendant's direction, Afolabi established a Shore United account for the Dometic Corporation scheme.   On or about June 20, 2018, Afolabi texted the defendant via WhatsApp to ask, "Which bank make i go."   The defendant responded, "Shore United google am."   On or about June 21, 2018, entered a Shore United Bank branch and established the Shore United Bank account with account number ending in 3921 ("Shore United Account 3921"), in the name of "Dometic Corporation," using the false alias A.S.   While Afolabi was inside the bank, he texted the defendant to inform him, "Them dey cooy id lol," apparently referring to bank personnel copying Afolabi's false ID (*i.e.*, "co[p]y id") as part of the account opening procedure. The defendant responded, "Oh ok but them Dey cool so far?" to which Afolabi replied, "Yeah."

On or about June 26, 2018, a stolen check in the amount of $75,499.33, payable to "Dometic Corporation," was deposited into Shore United Account 3921.   The check was identical to the image previously provided to the defendant by Adeniyi.   Thereafter, the defendant directed Afolabi to conduct a number of debit transactions and cash withdrawals from the account, including three large debit transactions at a Wal-Mart in the District of Columbia on or about July 16, 19, and 27, 2018.

During a consensually recorded phone call approximately one month later, on July 31, 2018 between the defendant and PERSON A about planning further schemes, the defendant appeared to boast about the ongoing success of the Dometic Corporation scheme.   He told PERSON A that he knew a bank in Maryland which he referred to as "First United (indiscernible) . . . Some bank in Maryland"—possibly conflating First National Bank of Pennsylvania and Shore United Bank.   The defendant told PERSON A that the bank was "small"

and "[t]hey're not hip to nothing."   He further stated, "But they're sweet for sure, trust me.   They

small as [f***].   My—we been—the 75K over a month.   That [s***] still got like 7K and that

[s***] is still going on . . . ."   Ex. 1, at 3-4.   As of July 31, 2018, the remaining balance in Shore

United Account 3921 was $7,146.98.

### D.  Contract Supply LLC & O-I Packaging Solutions LLC (Counts One, Two, and Three)

In or about May 2018, the defendant contacted PERSON A to recruit PERSON A to

participate in a fraudulent scheme involving stolen checks.   The defendant requested that

PERSON A provide a photograph of PERSON A's face, which would be used to create a false ID.

PERSON A provided the defendant with a photograph using the encrypted messaging application

"WhatsApp."

On or about July 23, 2018, the defendant provided PERSON A with a fraudulent New

Jersey driver's license bearing the name of IDENTITY THEFT VICTIM A, but with PERSON

A's photograph.   The defendant also provided PERSON A with a prepaid debit card in the name

of IDENTITY THEFT VICTIM A and $200 in cash for use in registering a corporation.

The defendant instructed PERSON A to register a corporation in the District of Columbia

in the name of "Contract Supply LLC."   On or about July 24, 2018, acting pursuant to instructions

from the defendant, PERSON A registered "Contract Supply LLC" with the District of Columbia

Department of Consumer and Regulatory Affairs, using the identity of IDENTITY THEFT

VICTIM A.

The defendant also instructed PERSON A to register a second corporation in Maryland in

the name of "O-I Packaging Solutions LLC."   Further on or about July 24, 2018, the defendant

and PERSON A traveled together to Baltimore, Maryland, where PERSON A, acting pursuant to

instructions from the defendant, registered "O-I Packaging Solutions LLC" with the State of Maryland Department of Assessments and Taxation, using the identity of IDENTITY THEFT VICTIM A.

During the drive to Baltimore, the defendant showed PERSON A photographs of several stolen checks on his phone.   He explained why he selected the O-I Packaging Solutions check out of several options.   One of the checks was made out to a company called "Alabama Cutting Technologies."   The defendant stated, "I am talking from experience because when you go in the bank there, you're asking your question, oh, why did you name your business this . . . it's like, how do you wanna explain Alabama Cutting Technologies . . . ."   He dismissed other checks "because the money's too low."   Then he identified the O-I Packaging Solutions check:   "But it's another one for 17,000 and has a good name."

On or about July 26, 2018, the defendant instructed PERSON A to open a bank account in the name of "Contract Supply LLC" using the identity of IDENTITY THEFT VICTIM A.   The defendant further instructed PERSON A to open a bank account in the name of "O-I Packaging Solutions LLC," also using the identity of IDENTITY THEFT VICTIM A.   The defendant directed PERSON A to deposit $100.00 into each new bank account in the name of "Contract Supply LLC" and "O-I Packaging Solutions LLC," and promised to provide $200.00 for such purpose.

On or about July 26, 2018, the defendant provided PERSON A with a valid Social Security Number belonging to IDENTITY THEFT VICTIM A, for use in establishing bank accounts in the names of "Contract Supply LLC" and "O-I Packaging Solutions LLC."   On or about July 27,

2018, the defendant transmitted $200.00 to PERSON A using the application "Cash App," which is an application used to send and receive money.

On or about July 27, 2018, acting pursuant to instructions from the defendant, PERSON A established a BB&T bank account with account number ending in 3033 in the name of "Contract Supply LLC" ("BB&T Account 3033") at a BB&T bank branch in the District of Columbia, using the identity of IDENTITY THEFT VICTIM A.   After opening BB&T Account 3033, PERSON A provided the account number and other bank account information to the defendant.

On or about July 30, 2018, acting pursuant to instructions from the defendant, PERSON A established a Woodforest National Bank account with account number ending in 2200 in the name of "O-I Packaging Solutions LLC" ("Woodforest Account 2200") at a Woodforest National Bank branch in Hyattsville, Maryland, using the identity of IDENTITY THEFT VICTIM A.   After opening Woodforest Account 2200, PERSON A used WhatsApp to send an image of the checkbook for Woodforest Account 2200 to the defendant.

On or about July 30, 2018, the defendant met with PERSON A and provided PERSON A with a stolen check in the amount of $34,957.50, payable to "Contract Supply" and a stolen check in the amount of $17,579.94, payable to "O-I Packagin [*sic*] Solutions."   During the meeting, the defendant described his plan to deposit and launder the O-I Packaging Solutions check:   "So, my plan with this is—because it's 17k, we can just go [indiscernible] twice and get it out.   Because I think that you can use I think up to 8,000 or 9,000 from the card."   The defendant instructed PERSON A to provide him with the deposit receipt, so he could forward the confirmation to his upstream source, believed to be Doug:   "When you drop it, just send me the receipt.   Let me send to the guy."   Ex. 2, at 7-8.

On or about July 30, 2018, acting pursuant to instructions from the defendant, PERSON A deposited the stolen check in the amount of $34,957.50, payable to "Contract Supply" into BB&T Account 3033 at a BB&T branch in Alexandria, Virginia.

On or about July 31, 2018, acting pursuant to instructions from the defendant, PERSON A attempted to deposit the stolen check in the amount of $17,579.94, payable to "O-I Packagin [*sic*] Solutions" into Woodforest Account 2200 at a Woodforest National Bank branch in Sterling, Virginia.   However, Woodforest National Bank declined to accept the deposit of the above-referenced stolen check in the amount of $17,579.94.

On or about August 7, 2018, the defendant and PERSON A engaged in a text message conversation via WhatsApp.   PERSON A inquired about the Social Security Number that the defendant provided to PERSON A for use in the schemes:

PERSON A:   Also what kind of ssn is this? A real or cpn?

Defendant:   It's a real one

PERSON A:   Are you sure

Defendant:   Yea / Not cpn

Following the failure of the O-I Packaging Solutions and Contract Supply LLC schemes, the defendant continued to plan for ways to involve PERSON A in additional schemes.

On August 10, 2018, the defendant called PERSON A to discuss committing a scheme at a bank in the Baltimore area.   The defendant explained that "they don't put holds on there," and "we did a deposit like two days ago and the rest of the money was there . . . if they don't trust you, they'll put a hold,.   But if they trust you, they just leave it."   Ex. 3, at 2-3.   He promised

PERSON A that he would provide her with a new false identity:   "So basically, I'm gonna give you a name and I'll make—I'm gonna make a—I'm gonna make a face."   *Id.*

### A. Procedural History

The defendant was originally indicted on August 16, 2018, on two counts of Bank Fraud, in violation of 18 U.S.C. § 1344(2), and one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028(a)(1).   He was arrested on August 28, 2018, and arraigned on the indictment on the following day.   As detailed more extensively in the Government's Opposition to Defendant's Motion for a *Kastigar* Hearing, ECF No. 65, the defendant initially participated in two debriefings, and received his first plea offer on January 25, 2019.   A slightly modified version of that plea offer was extended on February 11, 2019.   The defendant declined to accept these plea offers. The government extended another plea offer on February 21, 2019.   This was in the nature of a "global" plea offer that included both indicted and as-yet unindicted conduct.   This plea offer was not accepted.

On March 26, 2019, the government obtained a Superseding Indictment against the defendant, adding two counts of Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h), in addition to the charges in the original Indictment.

On July 4, 2019, the government extended another plea offer to the defendant.   This plea offer expired without being accepted by the defendant.   The government extended the July 4, 2019 plea offer to allow the defendant to review his plea options after he retained new counsel, but it was not accepted.

Multiple trial dates were scheduled in this case, but these dates were continued to accommodate changes in the defendant's representation and due to the COVID-19 pandemic. Most recently, a jury trial was scheduled to commence on May 24, 2021.

The defendant filed a motion for a *Kastigar* hearing on December 30, 2020.   The motion was extensively briefed, and an evidentiary hearing was held on February 12, 2021.   On February 18, 2021, the Court issued an order denying the defendant's motion.

On March 7, 2021, the government extended its final plea offer to the defendant.   The defendant did not accept the offer.   However, the defendant elected to plead to the Superseding Indictment on April 1, 2021 without signing a Statement of Offense and without the benefit of a plea agreement.

## SENTENCING CALCULATION

### A. Statutory Maximums and Mandatory Minimums

**Bank Fraud (Counts One & Two):**   A violation of Bank Fraud, in violation of 18 U.S.C. § 1344(2), carries a maximum sentence of 30 years of imprisonment; a fine of $1,000,000, pursuant to 18 U.S.C. § 1344; a term of supervised release of not more than 5 years, pursuant to 18 U.S.C. § 3583(b)(1); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**Aggravated Identity Theft (Count Three):**   A violation of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1), carries <u>a mandatory fixed term of imprisonment of 2 years, to run consecutively with any other term of imprisonment</u>; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(2)-(3); a term of supervised release of not more than one year, pursuant to 18 U.S.C. § 3583(b)(3); mandatory restitution under

15

18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**Conspiracy To Launder Monetary Instruments (Counts Four and Five):**   A violation of Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h) and predicated on conspiracy to violate 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957, carries a maximum sentence of 20 years of imprisonment; a fine of $500,000 or twice the value of the property involved in the transaction, pursuant to 18 U.S.C. § 1956(a)(1); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

The Court must also impose a $100 special assessment under 18 U.S.C. § 3013. Additionally, U.S.S.G. § 5E1.2 indicates that the Court may impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.

### B.  Sentencing Guidelines Calculation

Because the defendant elected to plea without the benefit of a plea agreement, the parties did not agree on an estimated Sentencing Guidelines calculation.

### 1.  PSR Calculations

The Final Presentence Investigation Report ("PSR") calculated the defendant's Guidelines as set forth in the PSR, which is summarized below.   Counts One, Two, Four, and Five are grouped together pursuant to U.S.S.G. §§ 3D1.2(d) and 3D1.3(a).   The prevailing guideline for

this group ("Group 1") is U.S.S.G. § 2S1.1, for money laundering offenses.    The overall offense level for Group 1 is as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(1) | Offense level for Bank Fraud Conspiracy: | |
| U.S.S.G. § 2B1.1(a)(2) | Base offense level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(G) | More than $250,000 | +12 |
| U.S.S.G. § 2B1.1(b)(10)(C) | Sophisticated means | +2 |
| U.S.S.G. § 2S1.1(b)(2)(B) | Convicted under 18 U.S.C. § 1956 | +2 |
| U.S.S.G. § 2S1.1(b)(3) | Sophisticated laundering | +2 |
| U.S.S.G. § 3B1.1(b) | Manager/supervisor and criminal activity involved 5 or more participants | +3 |
| | **Offense Level** | **27** |
| | | |
| U.S.S.G. § 3E1.1(a) | Acceptance of responsibility | -2 |
| | **Adjusted Offense Level** | **25** |

For Count Three (Aggravated Identity Theft), the Guideline sentence is the term of imprisonment required by statute.    U.S.S.G. § 2B1.6(a).    Here, that is a term of imprisonment of 2 years, to run consecutively with any other term of imprisonment.    18 U.S.C. § 1028A(a)(1) & (b)(2).

The PSR calculated the defendant's criminal history score as 3, placing him in Criminal History Category II, based on the defendant's prior conviction on May 23, 2013 for Criminal Possession of Stolen Property in New York State and the fact that the defendant committed the instant offense while under a criminal justice sentence, including probation, *see* U.S.S.G. § 4A1.1(d).

Based on a total offense level of 25 and a criminal history category of II, the Guideline imprisonment range is **63 months to 78 months** for the Group 1 counts; in addition to a mandatory statutory sentence of **24 months** of imprisonment to be imposed consecutively to any other sentence, for Count Three.

### 2.   Government's Calculations

As set forth below, the government believes that the overall offense level for Group 1 should be calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(1) | Offense level for Bank Fraud Conspiracy: | |
| ***U.S.S.G. § 2B1.1(a)(1)*** | ***Base offense level*** | ***7*** |
| U.S.S.G. § 2B1.1(b)(1)(G) | More than $250,000 | +12 |
| U.S.S.G. § 2B1.1(b)(10)(C) | Sophisticated means | +2 |
| U.S.S.G. § 2S1.1(b)(2)(B) | Convicted under 18 U.S.C. § 1956 | +2 |
| U.S.S.G. § 2S1.1(b)(3) | Sophisticated laundering | +2 |
| U.S.S.G. § 3B1.1(b) | Manager/supervisor and criminal activity involved 5 or more participants | +3 |
| | **Offense Level** | **28** |
| U.S.S.G. § 3E1.1(a) | Acceptance of responsibility | -2 |
| | **Adjusted Offense Level** | **26** |

Based on a total offense level of 26 and a criminal history category of II, the Guideline imprisonment range is **70 months to 87 months** for the Group 1 counts; in addition to a mandatory statutory sentence of **24 months** of imprisonment to be imposed consecutively to any other sentence, for Count Three.

**Calculation of Base Offense Level:**   The government agrees with the PSR calculation in all respects save one.   Where the money laundering guideline, U.S.S.G. § 2S1.1(a)(1), directs the Court to cross-reference "the base level for the underlying offense from which the laundered funds were derived," the government respectfully submits that the defendant's base offense level under the general guideline for fraud and property offenses, U.S.S.G. § 2B1.1, should be calculated pursuant to § 2B1.1(a)(1), rather than § 2B1.1(a)(2).

To begin with, U.S.S.G. § 2S1.1(a)(1) refers to a defendant who either "committed the underlying offense" or "who would be accountable for the underlying offense" under principles of

relevant conduct, and directs the sentencing court to calculate the offense level for the underlying offense before applying certain specific offense characteristics for the defendant's laundering conduct.   Thus, for example, a money launderer who is responsible for the underlying offense that generated the funds being laundered, such as drug trafficking offenses, bank robbery, criminal infringement of a copyright, obstruction of justice, sex trafficking, or any number of other offenses, would be punished pursuant to the Guidelines calculation for the underlying offense, and then receive certain incremental enhancements based on the laundering conduct.   In most instances, those incremental enhancements include either +1 for spending the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1957; or +2 for engaging in efforts to promote or conceal the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956; and they may also include specific offense characteristics depending on the defendant's knowledge regarding the source of the funds, the sophistication of the laundering activity, or whether the defendant was in the business of laundering funds.   *See* U.S.S.G. § 2S1.1(b)(1), (2), and (3).

Here, the defendant engaged in a series of bank fraud schemes involving the deposit of stolen and unauthorized checks, which generated the illegal proceeds that were the subject of the money laundering conspiracies.   The relevant guideline for bank fraud, U.S.S.G. § 2B1.1, provides that the base offense level shall be 7 if two conditions are satisfied:

> if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more . . . .

U.S.S.G. § 2B1.1(a)(1).   If not, then the base offense level shall only be 6.   *Id.* § 2B1.1(a)(2). Bank fraud in violation of 18 U.S.C. § 1344 is a 30-year offense, and it is "referenced to" § 2B1.1 in Appendix A of the Sentencing Guidelines.   Thus, as a matter of logic and consistent with the

structure of U.S.S.G. § 2S1.1, the defendant's base offense level for laundering the proceeds of bank fraud should be calculated as if he were convicted of bank fraud.

The PSR writer, however, argues that the base offense level should only be 6, pursuant to § 2B1.1(a)(2), because the defendant was convicted of money laundering, which is not deemed "an offense referenced to this guideline" under § 2B1.1.   PSR at 31.   First, that ignores the fact that the defendant plainly *was* "convicted of an offense referenced to this guideline," namely, Bank Fraud in violation of 18 U.S.C. § 1344(2), in Counts One and Two.   As a matter of the literal text of the guideline, subsection (a)(1) applies and the base offense level should be 7.

Second, the PSR writer's approach would lead to anomalous results.   For instance, a defendant convicted of conspiracy to commit bank fraud would be punished more lightly than a defendant convicted of bank fraud, because the fraud conspiracy statute, 18 U.S.C. § 1349, is not "referenced to" § 2B1.1 in Appendix A of the Guidelines.   Defendants convicted of laundering the proceeds of basic property crimes (calculated under § 2B1.1) would be punished more lightly than other money laundering defendants—those convicted of laundering the proceeds of drug trafficking offenses, bank robbery, criminal infringement of a copyright, *etc.*—because other guidelines do not contain the same dual scheme as in § 2B1.1(a)(1)-(2).   And, by codifying an automatic -1 discount for laundering the proceeds of basic property crimes, the PSR writer's approach would nullify the incremental punishment scheme of § 2S1.1.   For example, a defendant who is responsible for bank fraud offenses, who was convicted under 18 U.S.C. § 1957 for spending more than $10,000 in the illegal proceeds, would receive no incremental punishment for the money laundering activity:   he would receive +1 for conviction under 18 U.S.C. § 1957 pursuant to § 2S1.1(b)(2)(A), but that enhancement would be cancelled out by the -1 discount

under the PSR writer's approach, leaving the defendant at the same offense level as if he had never been convicted of a money laundering offense.    This cannot be what the Sentencing Commission intended.

Some courts have articulated a rule that the base offense for money laundering predicated on a fraud offense is 6, unless the defendant was also convicted of the underlying fraud offense, in which case the base offense is 7.    *Compare United States v. Abdelsalam*, 311 F. App'x 832, 845 (6th Cir. 2009) (applying base offense level 6 where defendant was convicted of money laundering and receipt of stolen property, a 10-year offense); *with United States v. Nikolovski*, 565 F. App'x 397, 401-02 & n.4 (6th Cir. 2014) (distinguishing *Abdelsalam* and applying base offense level 7 where defendant was convicted of money laundering and bank fraud, because the defendant "was convicted of bank fraud under 18 U.S.C. § 1344, which Appendix A references to § 2B1.1 and which carries a maximum sentence of 30 years"); *see also United States v. Salado*, 590 F. App'x 692, 693 (9th Cir. 2015) (applying base offense level 7 where defendant was convicted of § 1957 and also "was convicted of the underlying offenses of mail fraud and bank fraud, each punishable by a statutory maximum term of imprisonment of twenty years or more").    Under this rule, the defendant's base offense level should be 7 because he was convicted of both bank fraud and money laundering conspiracy.

**Sophisticated means and sophisticated laundering:**    According to U.S.S.G. § 2B1.1 Application Note 9, the sophisticated means enhancement is appropriate where the offense involved "especially complex" or "intricate" means, such as "fictitious entities" or "corporate shells."    Here, the defendant's bank fraud offenses typically involved fraudulent shell

corporations, false IDs, the stolen identity of IDENTITY THEFT VICTIM A, and co-conspirators or other individuals used to open the bank accounts and deposit the stolen check.

According to U.S.S.G. § 2S1.2 Application Note 5, the sophisticated laundering enhancement is appropriate where the offense involved "complex or intricate" laundering activity, such as "fictitious entities," "shell corporations," or "two or more levels (*i.e.*, layering) of transactions."   Here, the defendant's laundering typically involved multiple levels of laundering—such as transferring criminal proceeds to co-conspirators or other accounts under the Defendant's control—often involving *additional* shell corporations and false aliases.

Courts have found it appropriate to apply *both* the sophisticated means enhancement for a fraud offense *and* the sophisticated laundering enhancement for a money laundering offense as long as there is an independent basis for both.   *See, e.g.*, *United States v. Cabrera*, 635 F. App'x 801, 808, 2015 WL 9487925 (11th Cir. Dec. 30, 2015) (unpublished) ("Because the two enhancements recognize and punish different harms from fundamentally different conduct, application of both enhancements is not impermissible double counting . . . ."); *United States v. Kassim*, 598 F. App'x 831, 831 (3d Cir. Apr. 15, 2015) (unpublished).

Here, the Defendant's conduct warrants enhancements at both levels.   For instance, in the Novotel scheme, the defendant directed his co-conspirator Afolabi to create the fraudulent shell corporation in the name of a false alias, A.S.   They used the Novotel account to deposit two checks:   the stolen check from the California municipality, which had been altered to change the name of the payee; and the unauthorized check from the apartment development in Midlothian, Virginia.   The fraud proceeds were then laundered by layering through a second account owned

by Afolabi; a check to United Petroleum Transport LLC, another shell corporation created by the defendant; and checks to other co-conspirators.

## SENTENCING RECOMMENDATION

### A. Sentencing Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory.   However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).   *Id*. at 49-50.   The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).   *United States v. Rita*, 551 U.S. 338, 347-351 (2007).   The § 3553(a) factors include, *inter alia*:   (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a)(1)-(7).

### B. Sentencing Recommendation

The government recommends that the Court sentence the defendant to at least a mid-level Guidelines sentence on the Group 1 counts (Counts One, Two, Four, and Five), in addition to statutory term of 24 months on Count Three, to be followed by three years of supervised release. Specifically, a sentence of 78 months for Group 1 represents the approximate mid-point of the Guidelines range.   Deducting a 6-month *Smith* departure results in a sentence of 72 months for Group 1.   Adding 24 months for Count Three results in an overall sentence of 96 months, or eight years.   Such a sentence would reflect the seriousness of the defendant's conduct, promote respect for the law, afford specific and general deterrence, and would be reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

### 1. The Nature and Circumstances of the Offense

The defendant engaged in an overlapping series of brazen bank fraud, identity theft, and money laundering schemes.   The charged schemes cover the time span of approximately one year—from in or about August 2017 through the date of the defendant's arrest on August 28, 2018. In just one year, the defendant organized and executed at least six overlapping schemes (Due South Concrete LLC; Novotel Medical Supply, LLC; Toyo Ink America LLC; Dometic Corporation; Contract Supply LLC; and O-I Packaging Solutions LLC), involving at least nine stolen or unauthorized checks from eight victims, and more than $350,000 in intended losses.   As documented in the government's Rule 404(b) motion, the defendant in fact committed many other schemes during the same time period.   *See* ECF No. 24.   The schemes were both numerous and sophisticated:   they typically involved one or more fraudulent shell corporations, the procurement and use of false IDs and stolen identity information, close coordination with multiple co-

24

conspirators, and layers of transactions to launder the illicit fraud proceeds.   The elaborate planning and relentless tempo of operations shows that the defendant did not simply suffer a momentary lapse of judgment; he made a conscious decision to devote himself to life of crime.

Indeed, part of what distinguished the defendant was the sophistication of his schemes. For example, during the July 24, 2018 recorded conversation with PERSON A, the defendant explained that he used real Social Security numbers ("socials") rather than a credit privacy number ("CPN"), because the stolen identity credentials would raise fewer red flags at victim banks:

> But I know nothing's gonna happen because me, I check—I check everything before, you know.   What you guys be using, the CPN thing, right?   I use social . . . When I go with socials and I check the socials with the bank, it's cool. I don't . . . when they're doing it, like, the system will tell the credit score.   They'll start offering you credit cards or offering you this or that, try offering you all this [s***] because they see that the credit's good.   But when you us—it just—I just— I know a couple—I know some banks that it will fly with them. . . .   But like, on one name I can get like, three, four socials.

Ex. 4, at 73-74.   The defendant also shared his opinions about various banks' ability to catch and prevent fraud.   He described one bank as "sweet" because "[t]hey're not very like, hip," but "[t]he only thing about them is they put a seven days hold."   He also knew which banks "will give you a card instantly," and which will place a hold.   *Id.* at 57-58.

The defendant was part of a web of criminal actors committing financial frauds in the D.C. region and beyond.   As illustrated by the charged schemes, the frauds typically originated with upstream suppliers of stolen checks—individuals like Endy, Adeniyi, Fola, or Doug.   The checks were stolen from victims across the United States, from as far away as Southern California and Eastern Washington State.   The fact that the checks were funneled to a professional money launderer on the other side of the country is testament to the unique role the defendant played in this illicit underground economy.   Indeed, the defendant was a member of a small fraternity of

25

sophisticated professional money launderers, including the defendant's former associate, Michael Orji, who was arrested in November 2017 and prosecuted before this Court.   *See United States v. Michael Afram Orji*, No. 18-cr-68 (BAH).   The defendant received the checks, masterminded the logistics of the schemes (including shell corporations, bank accounts, and false IDs), recruited close co-conspirators to carry out much of the legwork (opening bank accounts, depositing checks), and then relied on a larger network of co-conspirators to receive and launder the proceeds of the bank fraud schemes.

Here, the defendant recruited and closely managed his co-conspirator Samson Olawale Afolabi, a/k/a Wale, and used Afolabi to carry out the Novotel and Dometic Coproration schemes. Communicating via the encrypted messaging application WhatsApp, the defendant directed the younger Afolabi at every step of the way, instructing him on how to fill out corporate registration paperwork, which banks to go to, how to launder out the fraud proceeds.   In the Dometic Corporation scheme, the defendant was even coaching Afolabi in real time, via WhatsApp, while Afolabi was inside the bank in the middle of opening his fraudulent account.   The defendant also sought to recruit and direct PERSON A, who, unknown to the defendant, was acting under the direction of federal law enforcement at the time.   The defendant procured a false ID and stolen identity for PERSON A, accompanied her to register a fraudulent shell corporation used in the schemes, provided her with stolen checks, and instructed her on how to deposit and launder the checks.

The defendant's crimes inflicted significant harm.   Victim losses from the charged crimes total at least $124,157.99.   While this is less than the intended loss of $355,745.29, that is only because banks or victim companies have invested (at their own expense) in precautionary measures

to prevent fraud, and because banks frequently reimburse their customers for fraud losses. From the defendant's perspective, it was a numbers game; he could assume that a certain percentage of his schemes would be caught, but he would still profit from the checks that cleared and were successfully laundered.

In short, the sophistication, scale, and impact of the defendant's crimes supports a serious term of imprisonment within the Guidelines range.

### 2. The History and Characteristics of the Defendant

The defendant is a professional fraudster and money launderer who has been undeterred by his own previous encounters with the criminal justice system or by the arrest of his close associate, Michael Orji, in November 2017.

The defendant was convicted in New York State of Criminal Possession of Stolen Property in the Third Degree on May 23, 2015. Court records indicate that the defendant was originally charged with additional, more serious charges—Identity Theft in the First Degree and Grand Larceny in the Third Degree—but eventually pled to the lesser possession of stolen property charge. *See* ECF No. 6-5 (Ex. E to Gov't Detention Mem.). The defendant received a sentence of five years' probation, set to expire on May 23, 2018.

Despite receiving the opportunity for a second chance, the defendant continued to commit crimes while on probation, including the Due South Concrete scheme, the Novotel scheme, and reaching out to recruit PERSON A to begin procuring a false ID and laying the groundwork for the I-O Packaging and Contract Supply schemes. In WhatsApp chats with an individual identified in the defendant's phone as "Afam," believed to be Michael Afram Orji, the defendant stated that he could not control himself from taking "risks" while on probation: "Iv been trying

to control myself bro / I Dey take all these risks while on probation."    *See* ECF No. 31-2 (Ex. 2

to Gov't Opp. to Def. Emergency Motion for Release).

The defendant has shown little remorse for his actions.    Indeed, he told PERSON A that

he believed bank fraud was a victimless crime.

> Yeah, but guess what though.   This same bank, right?   Because everything goes
> through insurance, you know, because they're getting the money from us every day
> anyways in different ways.   So, it's like, if you—if you understand the money
> thing mentally, you will understand why it's—sometimes you can be like [f***]
> them.

Ex. 4, at 67.

The defendant's recidivism, lack of remorse, and the absence of mitigating circumstances

provide support for a mid-Guidelines sentence.

### 3.  The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment; To Afford Adequate Deterrence; and To Protect the Public from Further Crimes of the Defendant

The Defendant's fraud and money laundering offenses were sophisticated and deliberate,

they caused substantial harm, and they were undeterred by law enforcement intervention.   The

sentence in this case should reflect the seriousness of the underlying offense as well as the need to

incapacitate and provide specific deterrence for the defendant.

As this case illustrates, financial fraud often goes hand-in-hand with money laundering.

The money laundering statutes are intended to take the profit out of crime—to target "not only

certain unlawful cash-generating schemes, but also the means by which they are practically carried

out and hidden from investigators."    *United States v. Iacoboni*, 363 F.3d 1, 6 (1st Cir. 2004); *see*

*also United States v. Bockius*, 228 F.3d 305, 310 (3d Cir. 2000) ("Congress intended to punish

[the] use of criminally derived proceeds separately from and in addition to the criminal conduct

which produced them.").   As the D.C. Circuit has noted, the gravity of the harm caused by money laundering is reflected in the applicable Sentencing Guideline:   "'[U.S.S.G.] Section 2S1.1 measures the harm to society that the money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains.'"   *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1356 (D.C. Cir. 2002) (quoting *United States v. Allen*, 76 F.3d 1348, 1369 (5th Cir. 1996)).

It is important to impose a sentence that will be sufficient to discourage others from participating in such schemes.   General deterrence is a "crucial factor in sentencing decisions for economic" crimes.   *United States v. Morgan*, No. 13-6025, 635 F. App'x 423, 450 (10th Cir. Nov. 6, 2015) (unpublished).   The legislative history of section 3553 documents Congress's emphasis on general deterrence in white-collar crime.   *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime").   "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citation omitted).   The sentence in this case should reflect not only the need to incapacitate and specifically deter the defendant from future crimes, but also to send a message the bank fraud, identity theft, and money laundering are serious offenses that demand significant punishment.

### 4.   The Need To Avoid Unwarranted Sentencing Disparities

The principal method to avoid unwarranted sentencing disparities is to adhere to the range recommended by the Sentencing Guidelines, which are intended to standardize sentencing practices across federal courts.   *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the

District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.").

The government's proposed sentence would not create any unwarranted disparity with the sentence received by the defendant's former associate, Michael Orji, who entered into an early plea agreement to plead to Conspiracy To Commit Bank Fraud, in violation of 18 U.S.C. § 1349, and Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h), related to schemes totaling more than $5.7 million in intended loss. *See* 18-cr-68 (BAH). This Court sentenced Orji to 120 months of imprisonment. But the circumstances of Orji's case are not a close match to this case. The intended loss of $5.7 million in Orji's case was far higher than the intended loss here, and Orji had a much higher criminal history score (Category V). On the other hand, Orji was not charged with the additional conduct of Aggravated Identity Theft, he elected to plead early, and he benefitted from the Court granting a downward departure from his calculated Guidelines offense level. In any event, while the government does not believe the Orji case is directly comparable here, the government is asking for a lower sentence for the defendant than the 120 months of imprisonment that Orji received.

### 5.   The Need To Provide Restitution

Restitution is an important factor in this case. However, given the Defendant's limited financial resources, lack of legitimate employment, and the likelihood that he will be removed from the United States following any sentence, the need to provide restitution does not weigh heavily in the determination of his sentence.

The government agrees with the defendant that the total restitution judgment in this case should include a total of $124,157.99, including payments to:

**$50,353.42** to Peachtree Residential, LLC

**$6,054.57** to First United Bank of Pennsylvania

**$67,750.00** to Shore United Bank

The government has provided victim payment addresses to the assigned Probation Officer.

### 6. Other Issues

**Forfeiture:**   In Counts Four and Five, the defendant was convicted of Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h).[1]   Pursuant to 18 U.S.C. § 982(a)(1), the court is required to order the forfeiture of "any property, real or personal, involved in such offense, or any property traceable to such property."

In general, "[m]oney laundering forfeiture pursuant to § 982(a)(1) applies to a larger class of property than proceeds forfeiture."   *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012).   Property involved in a money laundering offense includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense."   *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citation omitted).

Rule 32.2(b)(1)(A) provides that the Court shall determine "the amount of money that the defendant will be ordered to pay."   "The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."   Fed. R. Crim. P.

---

[1]  There is no forfeiture associated with Counts One and Two because federal law enforcement, working with PERSON A, was able to prevent the stolen checks from successfully clearing, and thus those bank fraud offenses generated no "proceeds" that would be subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

32.2(b)(1)(B); *see also United States v. Smith*, 770 F.3d 628, 641 (7th Cir. 2014) ("[T]he Federal Rules of Evidence do not apply at the forfeiture and sentencing stage . . . ."). The government's forfeiture calculations need not be exact, because criminals rarely keep detailed receipts of their ill-gotten gains. *See DeFries*, 129 F.3d 1293, 1315 (D.C. Cir. 1997) ("[T]he the punitive purpose of the forfeiture provision should not be subverted by a rule that could obscure that purpose with technical . . . calculations. Indeed, construing the statute more narrowly could hinder the actualization of [the statute's] punitive intent."); *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011) ("[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture . . . because the purpose of forfeiture is punitive rather than restitutive, district courts are not required to conduct an investigative audit to ensure that a defendant 'is not deprived of a single farthing more than his criminal acts produced.'") (quoting *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498 (2d Cir.1985)).

Here, the government is seeking a forfeiture money judgment in the amount of $303,207.84. That represents the sum of the stolen and unauthorized checks that were successfully deposited, and which the defendant and co-conspirators conspired to launder, in the Due South Concrete scheme, the Novotel scheme, the Toyo Ink America scheme, and the Dometic Corporation scheme. The defendant's sworn admissions during the April 1, 2021 plea colloquy to participating in these schemes and conspiring to launder the resulting proceeds should be sufficient to support the requested forfeiture money judgment.

**Debriefings:** As the Court is aware from the defendant's *Kastigar* motion, the defendant initially agreed to voluntarily debrief with federal law enforcement pursuant to a proffer letter. The defendant then decided to stop his cooperation and declined to enter into a cooperation

agreement with the government.   The government's sentencing recommendation reflects the limited value of the defendant's short-lived cooperation.

**Immigration consequences:**   The defendant is a foreign national who is likely to face deportation following his criminal sentence.   The government does not oppose a 6-month *Smith* departure, which is incorporated into the government's sentencing recommendation.

## <u>CONCLUSION</u>

For the foregoing reasons, the information reflected in the PSR, and the record in this case, the United States respectfully requests that the defendant be sentenced to a period of 72 months of imprisonment for Counts One, Two, Four, and Five; 24 months of imprisonment for Count Three, which is consecutive to any other sentence; and three years of supervised release.   In addition, the United States respectfully requests the imposition of a restitution judgment in the amount of $124,157.99 and entry of the attached Preliminary Order of Forfeiture and imposition of a forfeiture money judgment in the amount of $303,207.84.

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

BY:   */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Charles Willoughby, Jr., Virgin Islands Bar No. 1202
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7153 (Brown)
(202) 252-7096 (Willoughby)
Christopher.Brown6@usdoj.gov
Charles.Willoughby2@usdoj.gov

33